1   MARC J. FAGEL (Cal. Bar No. 154425)
    MARK P. FICKES (Cal. Bar No. 178570)
2     fickesm@sec.gov
    SUSAN L. LAMARCA (Cal. Bar No. 215231)
3     lamarcas@sec.gov
    JEREMY E. PENDREY (Cal. Bar No. 187075)
4     pendreyj@sec.gov

5   Attorneys for Plaintiff
    SECURITIES AND EXCHANGE COMMISSION
6   44 Montgomery Street, Suite 2600
    San Francisco, California  94104
7   Telephone:  (415) 705-2500
    Facsimile:  (415) 705-2501

8

9                  **UNITED STATES DISTRICT COURT**

10                 **NORTHERN DISTRICT OF CALIFORNIA**

11

12                                          CV  08      3517

    SECURITIES AND EXCHANGE COMMISSION,     Case No. _____
13
                   Plaintiff,
14
           vs.
15                                          PLAINTIFF SECURITIES AND
    ROBERT C. BROWN, JR. AND TREBOR COMPANY EXCHANGE COMMISSION'S
16  (AKA TREBOR INVESTMENT COMPANY, TREBOR  MEMORANDUM OF POINTS AND
    SEMINARS, TREBOR GROUP AND TREBOR GROUP AUTHORITIES IN SUPPORT OF *EX*
17  FUND),                                  *PARTE* APPLICATION FOR
                                            TEMPORARY RESTRAINING
18                 Defendants,              ORDER AND ORDER TO SHOW
                                            CAUSE RE PRELIMINARY
19         and                              INJUNCTION

20  DUANE EDDINGS, CDC GLOBAL, INC. AND WISE
    INVESTORS SIMPLY EXCEL, LLC,
21
                   Relief Defendants.
22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.      INTRODUCTION .................................................................................................. 1

II.     STATEMENT OF FACTS ...................................................................................... 2

        A.      The Parties .................................................................................................. 2

        B.      Brown's Fraud .......................................................................................... 3

                1.      Brown Lured Clients With False Profit and No-Risk
                        Claims. ........................................................................................... 3

                2.      Brown Misappropriated Client Funds. ....................................... 5

                3.      Brown Lied To Investors About What Happened To
                        Their Money. ................................................................................. 6

                4.      Brown Refused to Testify. ............................................................ 8

        C.      Relief Defendants Received Investor Funds.................................... 9

        D.      Brown Continues To Solicit Investments. ......................................... 9

III.    LEGAL ARGUMENT ......................................................................................... 10

        A.      The Legal Standard for Ordering Temporary Relief. ...................... 10

        B.      Defendant's Deception, Misrepresentations and Omissions,
                and Misappropriation of Investor And Client Funds Constitute
                Securities Fraud. ....................................................................................... 11

                1.      The Antifraud and Fiduciary Provisions of the
                        Securities Laws.............................................................................. 11

                2.      Brown Fraudulently Misappropriated Funds and Lied
                        to Clients......................................................................................... 13

        C.      Injunctive and Related Relief Is Necessary and Appropriate. ........... 14

                1.      Restraining Order and Preliminary Injunction ....................... 14

                2.      Asset Freeze.................................................................................... 15

                3.      Accounting...................................................................................... 16

                4.      Repatriation.................................................................................... 16

5.   Expedited Discovery...............................................................17

6.   Order Preventing Alteration or Destruction of
     Documents ...........................................................................17

IV.   CONCLUSION.................................................................................17

1

**TABLE OF AUTHORITIES**

2

<u>CASES</u>

3

<u>Page</u>

4

*Aaron v. SEC*,

5

446 U.S. 680 (1980).................................................................................................. 11

*Basic Inc. v. Levinson*,

6

485 U.S. 224 (1988).................................................................................................. 11

7

*FSLIC v. Sahni*,

8

868 F.2d 1096 (9th Cir. 1989).................................................................................. 15

9

*FTC v. H.N. Singer, Inc.*,

668 F.2d 1107 (9th Cir. 1982).......................................................................... 15, 16

10

*Hollinger v. Titan Capital Corp.*,

11

914 F.2d 1564 (9th Cir. 1990) (en banc)................................................................ 11

12

*In re San Vicente Med. Partners, Ltd.*,

13

962 F.2d 1402 (9th Cir. 1992).................................................................................. 16

14

*Koehler v. Pulvers*,

614 F. Supp. 829 (S.D. Cal. 1985)........................................................................... 12

15

*Mayfield v. First Nat. Bank of Chattanooga*,

16

137 F.2d 1013 (6th Cir. 1943).................................................................................. 13

17

Navel Orange Admin. Comm. v. Exeter Orange Co., Inc.,

722 F.2d 449 (9th Cir. 1983).................................................................................... 10

18

19

*Republic of the Philippines v. Marcos*,

862 F.2d 1355 (9th Cir. 1988).................................................................................. 11

20

*SEC v. Bankers Alliance Corp.*,

21

Civ. A. No. 95-0428 (D.D.C. May 5, 1995)

22

(Friedman, J.), 1995 WL 590665 ........................................................................... 16

23

*SEC v. Capital Gains Research Bureau, Inc.*,

375 U.S. 180 (1963)........................................................................................... 12, 13

24

*SEC v. Cavanagh*,

25

155 F.3d 129 (2d Cir. 1998)..................................................................................... 16

26

*SEC v. Chemical Trust*,

[2000 Transfer Binder] Fed. Sec. L. Rep. (CCH)

27

¶ 91,291 (S.D. Fla. 2000)......................................................................................... 17

28

*SEC v. Colello,*
  139 F.3d 674 (9th Cir. 1998)................................................................................................ 14

*SEC v. Hickey,*
  322 F.3d 1123 (9th Cir. 2003).............................................................................................. 15

*SEC v. Int'l Swiss Invs. Corp.,*
  895 F.2d 1272 (9th Cir. 1990)......................................................................................... 15, 16

*SEC v. Mgmt. Dynamics, Inc.,*
  515 F.2d 801 (2d Cir. 1975)................................................................................................. 10

*SEC v. Murphy,*
  626 F.2d 633 (9th Cir. 1980).......................................................................................... 11, 14

*SEC v. Slocum, Gordon & Co.,*
  334 F. Supp.2d 144 (D.R.I. 2004)......................................................................................... 13

*SEC v. Trabulse,*
  526 F. Supp. 2d 1001 (N.D. Cal. 2007) ............................................................................... 14

*SEC v. Wencke,*
  622 F.2d 1363 (9th Cir. 1980).............................................................................................. 15

*SEC v. Zandford,*
  535 U.S. 813, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002)..................................................... 12, 13

*Simpson v. AOL Time Warner Inc.,*
  452 F.3d 1040 (9th Cir. 2006).............................................................................................. 12

*Southwest Voter Registration Educ. Project v. Shelley,*
  344 F.3d 914 (9th Cir. 2003)........................................................................................... 10, 14

*Steffen v. Gray, Harris & Robinson,*
  283 F. Supp. 2d 1272 (M.D. Fla. 2003) ............................................................................... 16

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976)) ............................................................. 11

*United States v. Dunn,*
  268 U.S. 121, 45 S.Ct. 451, 69 L.Ed. 876 (1925)................................................................. 13

*United States v. Elliott,*
  62 F.3d 1304 (11th Cir. 1995), *amended* 82 F.3d 989,
  *certiorari den.* 117 S.Ct. 161, 519 U.S. 859,
  136 L.Ed.2d 105................................................................................................................... 13

*United States. v. Odessa Union Warehouse Co-Op,*
  833 F.2d 172 (9th Cir. 1987)................................................................................................ 10

*Vernazza v. SEC,*
    327 F.3d 851 (9th Cir. 2003)..................................................................................................... 13

*Webster v. Omnitron Int'l,*
    79 F.3d 776 (9th Cir. 1996)...................................................................................................... 13

<u>STATUTES</u>

15 U.S.C. § 78j(b) ............................................................................................................................ 11

15 U.S.C. § 78u(d) ........................................................................................................................... 10

15 U.S.C. § 80b-2(a)(11).................................................................................................................. 12

15 U.S.C. § 80b-9(d) ........................................................................................................................ 10

15 U.S.C. §§ 80b-6............................................................................................................................ 12

15 U.S.C. §§ 80b-6(1), (2) ............................................................................................................... 12

<u>OTHER AUTHORITIES</u>

*In the Matter of Alexander V. Stein,* 59 S.E.C. Docket 1115,
    1995 WL 358127 (June 8, 1995) ............................................................................................... 12

<u>RULES</u>

Federal Rule of Civil Procedure 26(f).............................................................................................. 17

<u>REGULATIONS</u>

17 C.F.R. § 240.10b-5....................................................................................................................... 11

1 **I.    INTRODUCTION**

2    Since at least 2000, Robert C. Brown, Jr. ("Brown") and his sole proprietorship, Trebor

3 Company, (collectively, "defendants") misappropriated more than $20 million from hundreds of

4 investors who believed Brown would invest their money in the stock market.  Based on his

5 purportedly proven ability to invest successfully, Brown guaranteed astronomical returns to investors.

6 The vast majority of the money Brown raised, however, was never invested in the stock market.

7 Instead, Brown funneled investors' money into accounts that he controlled.  He treated these accounts

8 like personal slush funds, using the money to pay for lavish personal expenses such as repairs for his

9 Ferrari, limousine services, and expensive shopping trips with his girlfriend.  Brown also transferred

10 hundreds of thousands of dollars of investor money to his family members.  Brown further used

11 money from newer investors to pay so-called "profits" to other, favored investors, whose money

12 Brown never actually invested in securities.

13    Brown is currently attempting to raise additional money.  As recently as June 2008, Brown

14 promised an investor a return of 30% to 40% *per month* on his investment, which Brown purportedly

15 would invest in securities.  Brown also promised this investor a 10% commission on all money

16 Brown raises from any individuals referred to Brown by this investor.  In addition, Brown is

17 engaging in a new scheme to obtain investor money by instructing investors to open brokerage

18 accounts in their own names and then provide Brown their online user identification and passwords to

19 allow him to trade online in their accounts.  Brown is promising to split the profits with investors.

20    Brown has violated the antifraud provisions of the federal securities laws by

21 misappropriating client assets, making materially false and misleading statements in connection

22 with the purchase or sale of securities, and perpetrating a fraud on his investment advisory clients.

23 Accordingly, to preserve the status quo, and particularly to preserve any remaining investor assets

24 and to halt further solicitations by Brown, the Commission hereby requests that the Court enter a

25 temporary restraining order, an order freezing certain accounts Brown owns and controls, an order

26 requiring defendants Brown and Trebor Company to conduct an accounting, an order requiring

27 defendants Brown and Trebor Company to repatriate to the territory of the United States of

28

1 | America all assets and funds held by, or in the name of, or for the benefit of Brown and Trebor
2 | Company, and finally, other interim equitable relief.

3 | II.     **STATEMENT OF FACTS**

4 |        **A.     The Parties**

5 |        Defendant Robert C. Brown, Jr., age 55, resides in Hillsborough, California. Declaration

6 | of Jeremy E. Pendrey in Support of Ex Parte Application for Temporary Restraining Order and

7 | Order to Show Cause Re Preliminary Injunction ("Pendrey Decl."), ¶ 4. He is not registered with

8 | the Commission in any capacity. *Id.* at ¶ 5. In investigative testimony taken by the Commission's

9 | staff prior to filing the instant action, Brown refused to answer questions about his investment

10 | qualifications, Trebor Company, solicitation of investors, his investments, and misappropriation of

11 | investor funds based on his Fifth Amendment privilege against self-incrimination. *Id.* at ¶ 2.

12 |        Trebor Company is a sole proprietorship owned by Brown and is the name he has used for

13 | his investment "group." Pendrey Decl., ¶ 3, Ex.1. (Trebor is Robert spelled backward.) Brown

14 | has also used the names Trebor Investment Company, Trebor Seminars, Trebor Group, and Trebor

15 | Group Fund (collectively "Trebor Company"). *Id.* at Exs. 3, 7, 16.

16 |        Relief Defendant Duane Eddings ("Eddings"), age 48, resides in Vallejo, California.

17 | Pendrey Decl., Ex. 32. Eddings was the registered agent for service of process for Wise Investors

18 | Simply Excel, LLC and CDC Global, Inc. *Id.* at ¶ 6. Eddings was a member of Wise Investors

19 | Simply Excel, LLC and was CDC Global, Inc.'s president. *Id.* at ¶ 6, Ex. 33. He has received

20 | more than $50,000 from Brown. *Id.* at ¶16, Exs. 26, 36. In investigative testimony taken by the

21 | Commission's staff prior to filing the instant action, Eddings asserted his Fifth Amendment

22 | privilege against self incrimination and refused to answer the staff's questions. *Id.* at ¶ 7.

23 |        Relief Defendant Wise Investors Simply Excel, LLC ("WISE") is a California limited

24 | liability company based in Vallejo, California. Pendrey Decl., Ex. 32.

25 |        CDC Global, Inc. ("CDC") is a California S corporation based in Oakland, California.

26 | Pendrey Decl., Ex. 33. WISE transferred over $240,000 to CDC, and Brown wrote cashier's

27 | checks to CDC totaling in excess of $135,000. *Id.* at Exs. 23, 25, 33.

28 |

**B.    Brown's Fraud**

**1.    Brown Lured Clients With False Profit and No-Risk Claims.**

Starting in at least 2000 and continuing through the present, Brown solicited money from hundreds of investors by holding himself out as an expert investment adviser who had made millions of dollars for himself by trading in the stock market. Declaration of Teresa Bunch in Support of Ex Parte Application for Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction ("Bunch Decl."), ¶ 4, Ex. 1; Pendrey Decl., ¶ 12, Exs. 11-15. Brown told investors that he would invest their money in the "stock market," "stock," or "options." Declaration of William Michael McCombe, Jr. in Support of Ex Parte Application for Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction ("McCombe Decl."), ¶ 4; Bunch Decl. at ¶ 3; Declaration of Patrick Whitfield in Support of Ex Parte Application for Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction ("Whitfield Decl."), ¶ 6.

Brown lured investors with false and misleading promises of high returns and no-risk trading in securities. McCombe Decl., ¶¶ 4-5, 7, Ex. 1; Bunch Decl., ¶¶ 4, 7, Exs. 2, 5, 6, 9, 10, 12; Whitfield Decl., ¶ 6. He repeatedly assured investors that their investments were "guaranteed" and downplayed the potential risks of investing in stocks, telling them that he day-traded stocks and options, and that his method of trading ensured that he could make money in both up and down markets. McCombe Decl., ¶ 5; Whitfield Decl., ¶ 6; Pendrey Decl., Ex. 2 (36:11-20). Brown said that his method of trading was very low risk. *Id.* He even claimed that he had never lost money in the market. McCombe Decl., ¶ 5. Brown told investors that if their investments did not make as much money in the market as he promised, he would pay the difference out of his own pocket. Bunch Decl., ¶ 4; McCombe Decl., ¶ 5. He even told investors that he would pay the taxes on their profits. McCombe Decl., ¶ 5.

Brown offered investors two main types of Trebor Company investment "programs," each one promising phenomenal, guaranteed returns. Bunch Decl., Exs. 2, 5; McCombe Decl., Ex. 1. Brown documented the investments in the programs in written contracts. *Id.* First, starting in 2000, Brown offered a "Quarterly" program, which had variable returns on a quarterly basis, minus unspecified fees. Pendrey Decl., Exs. 3, 11. By 2004, Brown had changed the variable program to a

1   "24-Month High Yield" investment that promised returns of 63-90% per year, with profits to be paid

2   every four months. Bunch Decl., Exs. 2, 5; McCombe Decl., Ex. 1. In certain contracts, Brown

3   would take a 10% fee. Pendrey Decl., Ex. 18.

4         Beginning in 2002, Brown offered "double" agreements where he promised to double investor

5   money in 13 or 14 months, with profits to be paid in a lump sum at the end of the term. Pendrey

6   Decl., Exs. 4, 13, 14. In 2005, Brown offered a new 24-Month "double" agreement whereby he

7   promised that he would match investors' money with a dollar for dollar "gift" of his own money,

8   thereby instantly doubling their account balance and future returns. Bunch Decl., ¶¶ 6, 8, 12, 13, Exs.

9   5, 9, 12. In 2006, Brown offered yet another "double" agreement that promised he would double

10  investor money in only eight months. Pendrey Decl., ¶ 17, Ex. 27.

11        Brown's promises to investors were false when he made them. He never invested most

12  investor money, and thus he had no basis to promise any profits, let alone doubling investor money in

13  8, 13, 14 or 24 months. Pendrey Decl., Exs. 10, 24-26, 28-32, 37-43. In addition, Brown treated the

14  money raised from investors as his own and spent their money on personal expenses. *Id.*; McCombe

15  Decl., Ex. 2. Thus, he knew he could not possibly generate the astronomical returns he promised.

16  Finally, Brown used money from newer investors to pay so-called "profits" to other, favored

17  investors, whose money Brown never actually invested in securities. Pendrey Decl., Exs. 10, 24-26,

18  28-32, 37-43. Thus, Brown had to know that the so-called "profits" did not come from his success in

19  the stock market or from any money he could give investors as "gifts" pursuant to a "double"

20  agreement; rather, the purported profits came at the expense of newer investors.

21        A large number of Brown's investors had little or no prior experience investing in securities

22  and invested with Brown based on his false promises about high returns and no risk. Bunch Decl., ¶¶

23  5, 7; McCombe Decl., ¶¶ 3-5. Moreover, many of these investors did not have sufficient assets to

24  adequately assume the risks of investing in securities. For example, one couple, whose only other

25  investment was approximately $50,000 in a mutual fund in an individual retirement account (which

26  had been funded through retirement savings accrued working for the state government), invested their

27  entire retirement account and the entire equity in their home, a total of $300,000, representing their

28  life savings. Bunch Decl., ¶¶ 6-13. After receiving only about $22,000 in purported profit payments,

1   Brown stopped making any payments to them. *Id.* at ¶¶ 9, 15, 18. These clients repeatedly asked for

2   their money and Brown and Trebor Company frequently assured them that they would be paid. *Id.* at

3   ¶¶ 18-20. Despite these promises, Brown never paid them any further returns on their investment,

4   nor did he return any principal. *Id.* at ¶ 23.

5        Another investor was a phone company lineman who had no other investments (aside from

6   his 401(k) retirement account) and who was eager to make extra money in order to provide primary

7   care for his two children as well as to three nieces and nephews. McCombe Decl., ¶¶ 2-3. At

8   Brown's suggestion, this investor withdrew $10,000 from his 401(k) retirement account. *Id.* at ¶ 6.

9   He also borrowed an additional $50,000 by taking out an equity line of credit on his home. *Id.* at ¶ 7.

10  He invested the money with Brown. *Id.* at ¶¶ 7-8, Ex. 1. In part as a result of Brown's failure to pay

11  this investor the promised returns on his investment, the investor had to file for bankruptcy. *Id.* at ¶

12  17.

13              **2.     Brown Misappropriated Client Funds.**

14       From 2000 to at least 2007, Brown raised more than $20 million in investments from his

15  clients through his Trebor Company investment programs. Pendrey Decl. Exs. 10-15, 28-32, 37-43.

16  Brown's clients deposited their investment money into multiple accounts Brown used, including his

17  personal accounts, a Trebor Company account, and an account held in the name of WISE. *Id.*

18  Although Brown promised his clients that he would invest their money in the stock market, Brown

19  never even opened a Trebor Company brokerage account. Instead, he helped himself to millions of

20  dollars of client money to pay for lavish personal expenses. *Id.* Brown frequently used limousine

21  services that were unrelated to business, such as shopping excursions with girlfriends or outings to

22  professional football games and concerts. Whitfield Decl., ¶ 4, Ex. 1. Brown also used his clients'

23  investment money on repairs on his Ferrari, expensive clothes, hotels, and restaurants. Pendrey

24  Decl., Exs. 10-15, 23 (55:23-56:11), 28-29, 31, 37-38, 43.

25

26

27

28

1   Brown used his clients' investment money to pay so-called "employees," which included

2   family members.[1]  Pendrey Decl., Ex. 10.  For example, Brown paid his son approximately $70,000,

3   and gave about $35,000 each to his sister and another family member (either his mother or sister, who

4   have the same name).  *Id.*  Although Brown's son did some work researching stocks for Trebor

5   Company, Brown didn't use that work to guide investment decisions.  *Id.* at Ex. 23 (28:18-29:8).

6   Brown also used investment money to support his son and his son's children for several years by

7   providing them monthly gifts of approximately $3,000 to $4,000 for living expenses.  *Id.* (65:10-18).

8   Although Brown transferred a little over $4.2 million of his clients' investment money to his personal

9   brokerage account, he spent a substantial portion of this money on personal expenses, including his

10  Ferrari, expensive clothes and hotels.  *Id.* at Exs. 31, 43.  In a September 2000 newspaper article

11  about himself that he often distributed to potential investors, Brown claimed to be a humble man who

12  was so modest he didn't own a car and often took the bus.  Bunch Decl., Ex. 1.  Yet, soon after he

13  obtained client money, Brown began driving a Ferrari Testarossa luxury sports car.  Bunch Decl., ¶ 4,

14  Ex. 1; Pendrey Decl., Ex. 2 (51:13-52:2).

15      Brown used millions of dollars of investment money to make purported "profit" payments to

16  other favored clients, although Brown never actually invested most of their money.  Pendrey Decl.,

17  Exs. 24-26, 28-29, 31, 37-43.  Thus, in many cases, money that came in from newer clients was

18  simply transferred to the accounts of other clients in a Ponzi-like scheme.  *Id.*  For example, in

19  September 2005, Brown transferred money from a client directly to Brown's son's bank account, and

20  Brown instructed his son to pay the money to other clients without ever investing the money.  *Id.* at

21  Exs. 23 (44:25-45:9, 54:1-11), 24-26.

22      **3.      Brown Lied To Investors About What Happened To Their Money.**

23      Brown never told investors that he spent their money on himself or transferred it to other

24  investors.  To the contrary, Brown told his clients in writing that their investments were earning the

25

26  [1] Brown did not use fees collected for providing investment advice, nor did he use purported profits
    to pay these so-called salaries to family members.  Rather, investors transferred money directly to
27  Brown's bank accounts, and Brown subsequently transferred the money to family members.  Pendrey
    Decl., Exs. 10, 24-26, 28-29, 31, 37-43.
28

1   returns he had promised. Bunch Decl., ¶ 14, Ex. 13; Pendrey Decl., Ex. 7. During 2001 to 2005,

2   Brown directed an assistant to prepare and send investors account statements that falsely told them

3   they were earning returns as high as 13.1% quarterly. Pendrey Decl., Exs. 7, 9 (19:10-22:7), 11.

4   Similarly, clients who invested in the 24-Month High Yield program were sent statements showing

5   returns of up to 24% every 4 months. *Id.* at Exs. 9 (19:10-22:7), 12. Investors in the Double program

6   were sent statements showing that their account values had doubled in the time period Brown

7   promised. *Id.* at Ex. 5. Because Brown and Trebor Company had not actually invested the clients'

8   money, in reality, Brown's clients had not earned the returns reflected in Brown's false account

9   statements.

10       As a result of the false account statements, many investors "rolled over" their investments to

11   other programs, or purportedly reinvested their profits so that they would double again. Pendrey

12   Decl., Exs. 5-6. At the time his clients "reinvested" their "profits," Brown never told them he had

13   spent their original principal on personal expenses, on "salaries" to family members or on purported

14   "profit" payments to other investors. Moreover, as a result of the false promises Brown made and the

15   false account statements he provided to his clients, investors continued to tell friends and family

16   about Brown, which attracted even more investors to his fraudulent scheme.

17       By 2005, Brown was unable to pay his clients their purported profits, so he attempted to quell

18   concern about the lack of payments by lying again to investors. He promised several times in letters

19   addressed to a group of investors that checks would be sent out by a certain date, and then when the

20   date passed without investors having received any money, he would make up an excuse and promise

21   a new date. Bunch Decl., Exs. 18-20; McCombe Decl., Exs. 4-5; Whitfield Decl., Ex. 6-7; Pendrey

22   Decl., Ex. 21. Brown continues to promise investors that their money is coming. In letters to and

23   conversations with investors, Brown concocted elaborate excuses about what had happened to their

24   money. For example, Brown told clients in a letter that he would be "dissolving" Trebor Company

25   due to the difficulties that he was encountering in getting their money "due to the Patriot Act."

26   Pendrey Decl., Ex. 16. In August 2006, he again wrote a letter to investors claiming the Patriot Act

27   had made it "more than impossible" to keep his promises. McCombe Decl., Ex. 4; Whitfield Decl.,

28

1 | Ex. 6. In the letter, Brown stated, "You must know that I have never lost any of your capital, nor will

2 | I now." *Id.*

3 |      Brown told clients a variety of stories to explain the delay in getting their money back. For

4 | instance, Brown said he had moved their money to an investment in gold and silver, which

5 | supposedly explained why there would be a delay in investors getting their money back. Bunch

6 | Decl., ¶ 22. Also, Brown claimed that he was investing overseas with a group of ministers and even

7 | gave investors a phone number to call where they could listen to him on a conference call discussing

8 | the supposed investment. *Id.* at ¶ 21. He also informed investors that he had bought an island and

9 | would be selling it for a fortune, or alternatively, that investors could visit the island in their luxurious

10 | retirement. *Id.* at ¶ 22.

11 |      It is likely that Brown told his clients these stories as an explanation as to why he could not

12 | pay investors back immediately, instead dangling the prospect of even greater profits in the near

13 | future. However, after telling these fanciful stories, Brown never repaid the investors. Bunch Decl.,

14 | ¶ 22; McCombe Decl., ¶ 12.

15 |          **4.    Brown Refused to Testify.**

16 |      The Commission's staff served Brown with a subpoena requiring him to appear and provide

17 | testimony related to his investment advisory business. Pendrey Decl., ¶ 2. Brown refused to answer

18 | questions about his investment qualifications, Trebor Company, solicitation of investors, his

19 | investments, and misappropriation of investor funds based on his Fifth Amendment privilege against

20 | self-incrimination. *Id.* He refused to produce documents to the Commission's staff. *Id.* at ¶ 3.

21 | Brown even asserted through his counsel that he did not have responsive documents despite the fact

22 | that he had Trebor Company's records removed from the garage of a former employee several

23 | months earlier. *Id.* at ¶ Ex. 1, Ex. 8 (42:20-44:5). In addition, after Brown appeared before the

24 | Commission and invoked his Fifth Amendment privilege, Brown told investors that he met with the

25 | Commission's staff with his lawyer and the Commission "cleared" him of any wrongdoing. *Id.* at ¶

26 | 24, Ex. 35.

27 |

28 |

1    **C.    Relief Defendants Received Investor Funds.**

2    WISE and CDC received and possess money or other assets through defendant Brown and

3    Trebor Company's fraudulent scheme, material misrepresentations and omissions, and have no

4    legitimate claim to them. Pendrey Decl., Exs. 25, 32-33. WISE and CDC are controlled by Eddings.

5    *Id.* at ¶ 6, Exs. 32-33. At Brown's direction, investors deposited approximately $8.5 million to an

6    account held in the name of WISE from 2005 and 2007. *Id.* at ¶¶ 17, 21, Ex. 27, 32; Bunch Decl.,¶

7    12, Ex. 8. Eddings is the only signatory for the account. *Id.* During this time, Eddings transferred

8    more than $240,000 from the WISE account to a CDC account, which he also controls. *Id.* at ¶ 22,

9    Ex. 33. In September 2005, Brown used investor money to cause cashier's checks to be written to

10   CDC totaling more than $135,000. *Id.* at ¶ 16, Ex. 25. In 2005, Brown transferred $10,000 to

11   Eddings. *Id.* at ¶ 25, Ex. 36. Also in 2005, Brown caused his son to transfer $41,250 of investor

12   money to Eddings. *Id.*, at ¶¶ 15-16, Exs. 23 (49:17-50:4), 26.

13   The Commission's staff served Eddings with a subpoena requiring him to appear and provide

14   testimony related to money received from the defendants. Pendrey Decl., Ex. 7. Eddings refused to

15   answer questions based on his Fifth Amendment privilege against self-incrimination. *Id.*

16   **D.    Brown Continues To Solicit Investments.**

17   As recently as June 2008, Brown has solicited money from new investors. Pendrey Decl., ¶

18   26. Indeed, Brown told an investor in June 2008 that the investor would earn returns of 30% to 40%

19   per month as a result of Brown investing the money in stocks. *Id.* Brown also has promised the

20   investor a 10% commission on all the money Brown raises from other investors referred to Brown by

21   that investor. *Id.*

22   In addition, Brown has a new program instructing investors to open brokerage accounts in

23   their own names and then provide Brown their online user identification and passwords to allow

24   Brown to trade online in the investors' accounts. Pendrey Decl., ¶ 26, Ex. 19. Brown offered to split

25   any profits with investors. *Id.* at Ex. 19. Documents obtained by the Commission's staff suggest that

26   Brown has been trading securities through brokerage accounts held by TD Waterhouse Canada, Inc.,

27   a broker-dealer based in Ontario, Canada. *Id.* at Ex. 20. Although Brown has been losing money by

28   trading in these accounts, he is making risky trades on margin. For example, one account in which

1  Brown was trading had a balance in February 2008 of approximately $740,000. *Id.* Brown stated to

2  an assistant that the balance "needs to be $1,303,000 in 2.5 weeks" (emphasis original) just to break

3  even on his trading. *Id.*

## III.   LEGAL ARGUMENT

### A.   The Legal Standard for Ordering Temporary Relief.

6  The Commission seeks an order from the Court providing for a temporary injunction and

7  restraining order, pursuant to Section 21(d) of the Securities Exchange Act of 1934 ("Exchange

8  Act"), which provides in relevant part:

9  Whenever it shall appear to the Commission that any person is engaged or is about to
   engage in acts or practices constituting a violation of any provision of this title, [or] the
10  rules or regulations thereunder, . . . it may in its discretion bring an action in the proper
   district court of the United States . . . to enjoin such acts or practices, and upon a proper
11  showing a permanent or temporary injunction or restraining order shall be granted
   without bond.
12

13  15 U.S.C. § 78u(d). *See also* 15 U.S.C. § 80b-9(d).

14  When the Commission seeks a temporary restraining order pursuant to these statutes, relief is

15  appropriate upon a showing of *either*:  (1) a likelihood of success on the merits and the possibility of

16  irreparable injury; *or* (2) serious questions going to the merits and the balance of hardships tipping

17  sharply in the Commission's favor. *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d

18  914, 917 (9th Cir. 2003) (*en banc*).  Where, as here, the Commission brings an action to safeguard the

19  public interest and to enforce the federal securities laws, irreparable injury should be presumed. *See*

20  *United States v. Odessa Union Warehouse Co-Op*, 833 F.2d 172, 174-75 (9th Cir. 1987) (holding

21  irreparable injury presumed in federal agency action for injunctive relief); *Navel Orange Admin.*

22  *Comm. v. Exeter Orange Co.*, 722 F.2d 449, 453 (9th Cir. 1983) (same).  The Commission is not

23  required to prove irreparable injury or the inadequacy of legal remedies, as may be required of a

24  private litigant moving pursuant to Federal Rule of Civil Procedure 65.  Instead, the relief should be

25  granted when the Commission meets the statutory requirement of showing a likelihood of continued

26  violations of the securities laws, since the agency appears "not as an ordinary litigant, but as a

27  statutory guardian charged with safeguarding the public interest." *See SEC v. Mgmt. Dynamics, Inc.*,

28  515 F.2d 801, 808 (2d Cir. 1975).

1    As discussed below, the Commission's evidence establishes that the defendant has violated,

2 and that there is a reasonable likelihood that defendant will continue to violate, the securities laws

3 unless he is restrained and enjoined. In particular, absent a restraining order and the other relief

4 sought by the Commission, defendant will likely continue to misappropriate investor funds and

5 deceive current or new investors to obtain their money under the guise of trading in securities.[2]

6    **B.    Defendant's Deception, Misrepresentations and Omissions, and
      Misappropriation of Investor And Client Funds Constitute Securities Fraud.**

7

8    **1.    The Antifraud and Fiduciary Provisions of the Securities Laws**

9    The antifraud provisions of the Exchange Act, Section 10(b) and Rule 10b-5, prohibit fraud in

10 connection with the purchase or sale of securities. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

11 Conduct prohibited by these provisions includes the use of deceptive devices, or the making of any

12 untrue statement of a material fact, or omitting to state a material fact necessary in order to make the

13 statements made, in light of the circumstances under which they were made, not misleading. 17

14 C.F.R. § 240.10b-5.

15    To constitute fraud in connection with the purchase or sale of securities, the deception,

16 misstatement or omission must be made with "scienter," that is, knowingly, and must be "material."

17 *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (*quoting TSC Indus., Inc. v. Northway, Inc.*,

18 426 U.S. 438, 449 (1976)) (setting forth the materiality standard); *Aaron v. SEC*, 446 U.S. 680, 695

19 (1980). The Ninth Circuit has expressly held that recklessness satisfies the scienter requirement.

20 *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990) (en banc). Materiality is

21 established where there is a substantial likelihood that a reasonable investor would consider the

22 information important in making an investment decision. *TSC Indus.*, 426 U.S. at 449. *See SEC v.*

23 *Murphy*, 626 F.2d 633, 653 (9th Cir. 1980) ("Surely the materiality of information relating to

24 financial condition, solvency and profitability is not subject to serious challenge."); *Koehler v.*

25

26

27 [2] In hearing the Commission's motion, due to the exigencies, the Court has discretion to accept
   hearsay and other evidence that might be inadmissible at trial. *Republic of the Philippines v. Marcos*,
28 862 F.2d 1355, 1363 (9th Cir. 1988).

1  *Pulvers*, 614 F. Supp. 829, 842 (S.D. Cal. 1985) (material information includes, at a minimum,

2  "accurate information on the use of investor funds").[3]

3       The same conduct that violates the antifraud provisions of the Exchange Act, may also

4  constitute a breach of an investment adviser's fiduciary duties under Section 206 of the Investment

5  Advisers Act of 1940 ("Advisers Act"). 15 U.S.C. §§ 80b-6. *See SEC v. Capital Gains Research*

6  *Bureau, Inc.*, 375 U.S. 180, 191-92, 194, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) (advisers owe

7  fiduciary duty to deal with their clients in utmost good faith and complete candor).   Thus Section 206

8  of the Advisers Act makes it unlawful for any investment adviser, directly or indirectly:

9       (1) to employ any device, scheme, or artifice to defraud any client or prospective

10      client; [or]

11       (2)  to engage in any transaction, practice or course of business which operates as

12      a fraud or deceit upon any client or prospective client.

13  15 U.S.C. §§ 80b-6(1), (2).[4]  The statute reflects Congress's "recognition of the delicate fiduciary

14  nature of an investment advisory relationship, as well as a congressional intent to eliminate, or at

15  least to expose, all conflicts of interest which might incline an investment adviser – consciously or

16  unconsciously – to render advice which was not disinterested." *Capital Gains,* 375 U.S. at 191-92

17  (internal quotations and footnote omitted).  While the first subsection of the statute requires proof of

18  knowing or reckless conduct, the second does not "require proof of intent to injure or actual injury to

19  the client." *Id.* at 195.

20

21

22

---

23  [3] The "in connection with" requirement is satisfied if a scheme to defraud (whether or not

24  accompanied by a particular misrepresentation or omission) coincides with the sale (or purchase) of
securities. *SEC v. Zandford,* 535 U.S. 813, 820, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002); *Simpson v.*

25  *AOL Time Warner Inc.*, 452 F.3d 1040, 1050-51 (9th Cir. 2006).

26  [4] An "investment adviser" includes "any person, who for compensation, engages in the business of
advising others, either directly or through publications or writings, as to the value of securities or as

27  to the advisability of investing in, purchasing, or selling securities."  15 U.S.C. § 80b-2(a)(11).
Misappropriation of investor assets constitutes "compensation." *See, In the Matter of Alexander V.*

28  *Stein*, 59 S.E.C. Docket 1115, 1995 WL 358127 (June 8, 1995).

1          **2.    Brown Fraudulently Misappropriated Funds and Lied to Clients.**

2          Brown repeatedly and purposefully misappropriated client funds for his own uses.  His

3    conduct constitutes fraud under the Exchange Act, and a breach of his duty as an investment adviser

4    to his clients.  As the Supreme Court discussed in *SEC v. Zandford*, using the purchase or sale of

5    securities as an excuse to write unauthorized checks against clients' brokerage accounts is properly

6    viewed as a fraudulent course of business.  535 U.S. at 820, 122 S.Ct. at 1904 (citing *United States v.*

7    *Dunn,* 268 U.S. 121, 131, 45 S.Ct. 451, 69 L.Ed. 876 (1925)).  Similarly, conduct that includes

8    commingling client assets with the adviser's assets, or operating a ponzi scheme, or otherwise

9    secretly profiting at the expense of the client, violates an adviser's fiduciary duty to his clients and

10   operates as a fraud upon them.  *Capital Gains*, 375 U.S. at 196-97.  *See United States v. Elliott*, 62

11   F.3d 1304 (11th Cir. 1995), *amended* 82 F.3d 989, *certiorari den.* 117 S.Ct. 161, 519 U.S. 859, 136

12   L.Ed.2d 105 (ponzi scheme violated Section 206); *SEC v. Slocum, Gordon & Co.*, 334 F. Supp.2d

13   144 (D.R.I. 2004) (commingling clients' assets with firm's); *Vernazza v. SEC*, 327 F.3d 851, 859 (9th

14   Cir. 2003); *Mayfield v. First Nat. Bank of Chattanooga*, 137 F.2d 1013, 1018 (6th Cir. 1943) (holding

15   that fiduciary has a duty to provide detailed status report to clients of changes in assets under the

16   fiduciary's control).

17          Furthermore, Brown engaged in repeated lies, both to attract investors and to cover up his

18   scheme.  Brown misrepresented his credentials and experience, he falsely downplayed the risks of

19   trading in securities, and he made false promises guaranteeing tremendous profits.  He also gave

20   clients falsely inflated account values, and omitted to inform clients that he was stealing their money

21   to use on lavish personal expenses and to pay family members.  Brown also failed to disclose that he

22   used money raised from newer investors to pay so-called profits to other clients without having

23   actually invested the money entrusted to him by his clients.  Such misrepresentations and omissions

24   amount to fraud.

25          Brown acted with scienter.  Defendant's intent to deceive may be inferred from the very

26   nature of the scheme Brown perpetrated – using one client's money to repay another investor who

27   sought a return on his investment.  *See Webster v. Omnitron Int'l*, 79 F.3d 776, 785 (9th Cir. 1996)

28   ("[a] jury could rationally conclude that the promotion of a pyramid scheme demonstrates the

1  necessary fraudulent intent"). His fraudulent intent is also evidenced by his refusal to answer

2  questions in testimony on the grounds that he might incriminate himself. *See SEC v. Colello*, 139

3  F.3d 674, 677 (9th Cir. 1998) ("Parties are free to invoke the Fifth Amendment in civil cases, but the

4  court is equally free to draw adverse inferences from their failure of proof."); *SEC v. Trabulse*, 526 F.

5  Supp. 2d 1001, 1007, fn. 4 (N.D. Cal. 2007) (denying motion to dismiss SEC complaint for lack of

6  particularity, finding that the "Court is entitled to make an adverse inference" from defendant's

7  invocation of his Fifth Amendment privilege).

8      Brown's deception and his misrepresentations and omissions were also material. Brown's

9  misrepresentations attracted new investors, lulled existing clients, and in general, caused Brown's

10  fraud to balloon over a period of several years until he had harmed hundreds of clients by stealing

11  more than $20 million. Given the pervasiveness of his fraud, his misrepresentations, omissions and

12  deception are clearly material. *SEC v. Murphy*, 626 F.2d at 653.

13      **C.    Injunctive and Related Relief Is Necessary and Appropriate.**

14          **1.    Restraining Order and Preliminary Injunction**

15      As set forth above, the Commission's evidence of Brown's fraud to date establishes a

16  likelihood of success on the merits, and the further likelihood that Brown will continue to engage in

17  such conduct unless restrained and enjoined. Further, although irreparable injury should be

18  presumed, the evidence makes clear that without such an order, Brown will continue to solicit money

19  from current and potential clients. Moreover, existing investors will be harmed through the further

20  loss of their funds. To date, Brown has stolen more than $20 million, and he should not be permitted

21  to take any more. Thus, the statutory requirements both for a restraining order, and a permanent

22  injunction, are readily met. *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d at 917.

23      Accordingly, the Commission requests that the Court enter an order prohibiting the defendant

24  from violating the antifraud provisions set forth above. In order to address the specific harm to

25  clients in this case, and to maintain the status quo, the Commission requests that the Court further

26  restrain and enjoin the defendant from placing any order for securities for his own or another person's

27  account, or from making any transfers of money into or out of or otherwise exerting his control or

28

1 | influence over the brokerage or bank accounts of other persons as set forth in the Commission's

2 | proposed order.

3 |            **2.    Asset Freeze**

4 |            An order freezing bank and, potentially, brokerage accounts in the defendants' names, the

5 | relief defendants' names, and in the names of entities that the defendants or relief defendants own and

6 | control, is necessary to protect any remaining investor funds and to prevent their immediate

7 | dissipation.  This Court has the inherent equitable authority to issue ancillary relief in Commission

8 | injunctive actions, including the freezing of accounts or assets. *SEC v. Hickey*, 322 F.3d 1123, 1131-

9 | 32 (9th Cir. 2003); *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980); *SEC v. Int'l Swiss Invs.*

10 | *Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990).  An asset freeze is appropriate to prevent waste and

11 | dissipation of assets while litigation is pending, and to ensure their availability for restitution and

12 | disgorgement.  *E.g., FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112-13 (9th Cir. 1982).  Where the

13 | Commission has shown that it is likely to succeed on the merits, the mere possibility of dissipation of

14 | assets is sufficient to warrant an asset freeze; the Commission does not need to show that dissipation

15 | has occurred or is imminent. *FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th Cir. 1989).

16 |            A freeze of Brown's accounts is especially important under these circumstances.  The

17 | Commission has identified 9 bank accounts opened in defendants' or relief defendants' names that

18 | have already received investor funds.  At times, Brown has maintained and funded brokerage

19 | accounts in his name.  Also, Brown has been trading in brokerage accounts in Canada, which appear

20 | to be held in the names of others.  Brown should not be given the further opportunity to hide or

21 | dissipate additional assets.

22 |            Eddings received investor funds and controls WISE and CDC accounts that have received

23 | investor funds.  In addition, when asked about the receipt of funds and the receipt of investor funds

24 | by WISE and CDC, Eddings asserted his Fifth Amendment privilege and refused to answer any

25 | questions. *See SEC v. Hickey*, 322 F.3d at 1131-32 (holding that court could freeze third party assets

26 |

27 |

28 |

1  to protect asset freeze and disgorgement order against defendant).[5] Accordingly, the Commission

2  requests that the Court also freeze accounts opened in the names of the relief defendants.

3      The Court should also impose an asset freeze upon relief defendants' assets. A freeze on

4  relief defendants' accounts is appropriate where the relief defendant has received ill-gotten gains to

5  which the relief defendant does not have a superior legal right. *SEC v. Cavanagh*, 155 F.3d 129, 136

6  (2d Cir. 1998). So far, the Commission has identified 2 accounts in Eddings' name, and a WISE

7  account and several CDC accounts.

8          **3.    Accounting**

9      The Commission requests that this Court enter an order requiring defendants to submit a

10 verified accounting for the purpose of identifying: (i) the location and disposition of all funds

11 received from clients; (ii) the location and disposition of all accounts opened in the names of clients;

12 and (iii) the location and value of all personal or client (or other) assets presently held by defendants

13 (and relief defendants), or under the defendants' or relief defendants' control or over which they may

14 exercise actual or apparent authority. This accounting will assist the Court to determine the scope of

15 the fraudulent scheme and the appropriate scope of the asset freeze order. In addition, an order for an

16 accounting will make it more difficult for defendants to conceal assets in anticipation of a final order

17 requiring disgorgement and civil penalties. *See, e.g., SEC v. Int'l Swiss Invs. Corp.*, 895 F.2d 1272,

18 1274 (9th Cir. 1990); *FTC v. H.N. Singer*, 668 F.2d at 1114.

19         **4.    Repatriation**

20     Repatriation of assets held by defendants outside the United States will further protect

21 investors from dissipation of assets. *See, SEC v. Bankers Alliance Corp.*, Civ. A. No. 95-0428

22 (D.D.C. May 5, 1995) (Friedman, J.), 1995 WL 590665, (Commission sought enforcement of order

23 granting broad relief, including order to repatriate funds). Brown's use of Canadian brokerage

24 accounts held in the names of others makes repatriation appropriate in this case. Accordingly, the

25

26 [5] *See also Steffen v. Gray, Harris & Robinson*, 283 F. Supp. 2d 1272, 1282-83 (M.D. Fla. 2003)
   (following *Hickey* and ruling that asset freeze and disgorgement order reached off-shore trusts that
27 were not owned by defendant, but were nonetheless under his control); *In re San Vicente Med.
   Partners, Ltd.*, 962 F.2d 1402, 1406 (9th Cir. 1992) (ruling that district court could extend
28 receivership to any entity under defendant's control).

1  Commission requests that the Court order the defendants to repatriate all investor assets as set forth in

2  the Commission's proposed order.

3          **5.      Expedited Discovery**

4          Because of the urgent need for relief to prevent dissipation of assets, the Commission also

5  seeks expedited discovery to subpoena documents relating to the fraudulent scheme, in order to

6  determine the extent of the fraud, the disposition of investor funds to date, and to preserve any

7  remaining funds. The Commission will seek discovery, including depositions and documents, from

8  defendants and the relief defendants, as well, in order to obtain additional facts related to the fraud.

9  Accordingly, the Commission requests that the Court permit discovery to begin immediately, before

10  the parties have conferred in accordance with Rule 26(f) of the Federal Rules of Civil Procedure.

11          **6.      Order Preventing Alteration or Destruction of Documents**

12          To protect all remaining documents necessary for full discovery in this matter, the

13  Commission seeks an order preventing the alteration or destruction of documents. To this point, the

14  Commission has not been provided with access to all the relevant documents. Brown has not

15  produced many of the incriminating documents, such as bank records and his client agreements. In

16  addition, Brown may have hidden or destroyed relevant documents, which he removed from a former

17  employee's home. An order to preserve documents is therefore appropriate to protect the integrity of

18  this litigation. *SEC v. Chemical Trust,* [2000 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 91,291, at

19  95,642 (S.D. Fla. 2000).

20  **IV.    CONCLUSION**

21          For the foregoing reasons, the Commission respectfully requests that this Court grant the

22  relief requested.

23  Dated: July 23, 2008                    Respectfully submitted,

24

25

26                                          Mark P. Fickes

27                                          Jeremy E. Pendrey
                                            Attorneys for Plaintiff
28                                          SECURITIES AND EXCHANGE
                                            COMMISSION