1 | MARC J. FAGEL (Cal. Bar No. 154425)
MARK P. FICKES (Cal. Bar No. 178570)
2 |   fickesm@sec.gov
SUSAN L. LAMARCA (Cal. Bar No. 215231)
3 |   lamarcas@sec.gov
JEREMY E. PENDREY (Cal. Bar No. 187075)
4 |   pendreyj@sec.gov

5 | Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
6 | 44 Montgomery Street, Suite 2600
San Francisco, California 94104
7 | Telephone: (415) 705-2500
Facsimile: (415) 705-2501

8 |

**FILED**

JUL 2 3 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

9 |

10 | UNITED STATES DISTRICT COURT

11 | NORTHERN DISTRICT OF CALIFORNIA

12 | CV 08 3517

13 | SECURITIES AND EXCHANGE COMMISSION,

Case No. _____

14 |       Plaintiff,

15 |       vs.

APPENDIX OF AUTHORITY NOT
PUBLISHED IN OFFICIAL
REPORTERS IN SUPPORT OF
SECURITIES AND EXCHANGE
COMMISSION'S OPPOSITION TO
MOTION TO DISMISS

16 | ROBERT C. BROWN, JR. AND TREBOR COMPANY
(AKA TREBOR INVESTMENT COMPANY, TREBOR
17 | SEMINARS, TREBOR GROUP AND TREBOR GROUP
FUND),

18 |       Defendants,

19 |       and

20 | DUANE EDDINGS, CDC GLOBAL, INC. AND WISE
INVESTORS SIMPLY EXCEL, LLC,

21 |       Relief Defendants.

22 |

23 |

24 |

25 |

26 |

27 |

28 |

# APPENDIX OF UNPUBLISHED AUTHORITY

**Exhibit**

## CASE

*SEC v. Bankers Alliance Corp.*,
   Civ. A. No. 95-0428 (D.D.C. May 5, 1995) (Friedman,
   J.), 1995 WL 590665 .................................................................................................... 1

*In the Matter of Alexander V. Stein*,
   59 S.E.C. Docket 1115, 1995 WL 358127 (June 8, 1995) ........................................... 2

*SEC v. Chemical Trust.*,
   [2000 Transfer Binder] Fed. Sec. L. Rep. (CCH)
   ¶ 91,291, at 95,642 (S.D. Fla. 2000) ........................................................................... 3

# Exhibit 1

Westlaw.

Not Reported in F.Supp.                                                                           Page 1
Not Reported in F.Supp., 1995 WL 590665 (D.D.C.), Fed. Sec. L. Rep. P 98,717
**(Cite as: Not Reported in F.Supp., 1995 WL 590665 (D.D.C.))**

**H**S.E.C. v. Bankers Alliance Corp.
D.D.C.,1995.

United States District Court, District of Columbia.
SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,
v.
BANKERS ALLIANCE CORP., Carpe Diem
International, Inc., Lee Financial Group, Ltd., L.F.S.
Lee Financial Services, B.A. Holding Co., Roy Lee,
Steven Higley, Terry Plack, Wayne Wakefield,
Michael Saliba, Allan Nash, Michael Daily and John
Finegan, Defendants.
**Civ. A. No. 95-0428 (PLF).**

May 5, 1995.

Jonathan I. Golomb, Deborah Meshulam, Securities
and Exchange Commission, Washington, DC, for
plaintiff.
Stephen F. Black, Andrew B. Weissman, Wilmer,
Cutler & Pickering, Washington, DC, for defendants.

*OPINION ON MOTION TO RECONSIDER CIVIL
CONTEMPT ORDER*

FRIEDMAN, District Judge.
**\*1** On April 7, 1995, the Court issued an Order
holding Bankers Alliance Corp., Lee Financial
Group, Ltd., L.F.S. Lee Financial Services, B.A.
Holding Co., Roy Lee, Steven Higley, Allan Nash
and John Finegan (the "Bankers Alliance
defendants") in civil contempt of the Court's March
13, 1995, Preliminary Injunction. The Court found by
clear and convincing evidence that each of the
Bankers Alliance defendants had notice of the
Preliminary Injunction, that each had personally
signed it, and that the provisions of the Preliminary
Injunction, which the defendants negotiated through
counsel, are clear and unambiguous. The Court also
found that each of the Bankers Alliance defendants
had failed to provide an accounting that included
information as to the location and disposition of
investor funds and had failed to repatriate such funds,
as required by Paragraphs VII and VIII of the
Preliminary Injunction.[FN1] The Court concluded that
the excuses proffered by defendants for their failure

to comply with these provisions of the Preliminary
Injunction were inadequate and that their conduct
was contumacious.

On April 12, 1995, the Bankers Alliance defendants
filed a motion seeking reconsideration of the
contempt order. The Court gave counsel for the
Commission an opportunity to file an opposition and
scheduled a hearing for Thursday, April 20, 1995, at
which defendants Allan Nash and Roy Lee testified
and were cross-examined by counsel for the SEC.
Defendant John Finegan testified and was cross-
examined at the continuation of the hearing on April
26, 1995. The Court heard argument on the motion
on April 24 and April 26, 1995.

Upon consideration of the evidence presented and the
arguments made by the SEC and by counsel for the
Bankers Alliance defendants, the Court has
reconsidered its contempt order and has found no
basis to modify that order with respect to the entities
and Steven Higley. With respect to defendants Roy
Lee, John Finegan and Allan Nash, the Court
modifies its findings and the sanctions imposed to the
extent reflected in this Opinion and the
accompanying Order.

I. BACKGROUND [FN2]

On March 13, 1995, in response to Paragraph VII of
this Court's Preliminary Injunction, the Bankers
Alliance defendants submitted a Joint Accounting,
signed by each of them except for defendant John
Finegan. *See* Accounting of Bankers Alliance
Corporate Defendants ("Joint Accounting"),
Plaintiff's Exhibit No. 3 at Hearing on
Reconsideration. In the Joint Accounting, Messrs.
Higley, Lee and Nash and the entities have admitted
the receipt of at least $3.725 million from United
States investors through the investment program
described in the complaint. Nowhere in the Joint
Accounting is there a statement of the location and
disposition of funds received from investors as
required by the Court's Preliminary Injunction. In
addition, the defendants did not repatriate by March
20, 1995, all investor funds or assets, amounting to at
least the $3.725 million identified in the Joint
Accounting, as required by the Preliminary

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 2
Not Reported in F.Supp., 1995 WL 590665 (D.D.C.), Fed. Sec. L. Rep. P 98,717
**(Cite as: Not Reported in F.Supp., 1995 WL 590665 (D.D.C.))**

Injunction. The defendants have repeatedly represented that they would repatriate these funds but have not yet done so.

**\*2** In a contempt proceeding, the moving party has the burden of showing by clear and convincing evidence that (1) a court order was in effect, (2) the order required certain conduct by the respondent, and (3) the respondent failed to comply with the court's order. _Petroleos Mexicanos v. Crawford Enterprises, Inc., 826 F.2d 392, 401 (5th Cir.1987); see NLRB v. Blevins Popcorn Co., 659 F.2d 1173, 1183-85 (D.C.Cir.1981); SEC v. Current Financial Services, Inc., 798 F.Supp. 802, 806 (D.D.C.1992)._ While the burden of showing a violation of the court order is on the moving party, impossibility of performance constitutes a defense to a charge of civil contempt and a respondent who raises the defense of impossibility "must demonstrate his inability to comply 'categorically and in detail.' " _SEC v. Current Financial Services, Inc., 798 F.Supp. at 808_ (citations omitted); _see Tinsley v. Mitchell, 804 F.2d 1254, 1256 (D.C.Cir.1986)._ The Court found in its April 7, 1995, Opinion and Order that the SEC had proven by clear and convincing evidence that the Bankers Alliance defendants are in contempt of the Court's Order and concluded that the defendants had failed to prove impossibility.

On their motion for reconsideration, Messrs. Lee, Finegan and Nash again seek to show that compliance with the Court's Order is impossible. Messrs. Lee and Nash have each submitted a supplemental declaration, and all three have testified in open court about their lack of control over the investor funds and their lack of knowledge of the location and disposition of those funds. Mr. Finegan has changed his position dramatically, previously having invoked his Fifth Amendment privilege against self-incrimination, while Messrs. Lee and Nash have added detail to their prior conclusory assertions of impossibility. The corporate entities have produced no new evidence with respect to the issue of impossibility, and Mr. Higley, who remains in Singapore, continues to invoke his privilege against self-incrimination.

The Court must consider each defendant individually and, with respect to each, it must determine whether he or it has demonstrated that he or it is incapable of repatriating any or all of the investor funds or of providing more information about the location and disposition of such funds. To succeed on their motion to reconsider, each must demonstrate the inability to comply "categorically and in detail." _SEC v. Current Financial Services, Inc., 798 F.Supp. at 808._ The Court must also consider what remedial sanctions, if any, are appropriate with respect to each defendant to effectuate compliance with its Order. _See Hicks v. Feiock, 485 U.S. 624, 631-32 (1988); Matter of Trinity Industries, Inc., 876 F.2d 1485, 1493-94 (11th Cir.1989); NOW v. Operation Rescue, 747 F.Supp. 772, 774 (D.D.C.1990)._

## II. STEVEN HIGLEY AND THE ENTITIES

### A. Steven Higley

It has always been apparent that Steven Higley, the President of Bankers Alliance Corp., was the mastermind behind the scheme to defraud alleged by the SEC. What was not previously so clear, however, is just how thoroughly he directed the actions of his subordinates and how willingly they have followed his directions without question, both in perpetrating the alleged scheme and in consenting to a Preliminary Injunction with which they now maintain they knew they had no ability to comply, relying instead on Mr. Higley's promises that he would repatriate the money in time to comply with the Court's Order. While the Court does not credit much of what Messrs. Lee, Finegan and Nash have said in their testimony, the Court does note that references to the Svengali-like power they say Mr. Higley has over them pervades their testimony. If they are to be believed, that power has motivated their conduct much more than has the Court's Preliminary Injunction or the threat of sanctions for contempt. Messrs. Lee, Finegan and Nash now stand before this Court, in contempt of its order, while, conveniently, Mr. Higley, the man with the most knowledge of the location of the funds and the ability to repatriate them, isn't talking, choosing instead to send messages through his emissaries that the funds are on the way. Believing himself safely ensconced in Singapore, he invokes the Fifth Amendment.

**\*3** In citing Steven Higley for contempt on April 7, 1995, the Court concluded that the conclusory statements in Mr. Higley's declaration were insufficient to demonstrate a good faith basis to invoke his Fifth Amendment privilege in lieu of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                      Page 3
Not Reported in F.Supp., 1995 WL 590665 (D.D.C.), Fed. Sec. L. Rep. P 98,717
(Cite as: Not Reported in F.Supp., 1995 WL 590665 (D.D.C.))

providing the information required by the Court's Order. Merely declaring that to disclose the location and disposition of investor funds would incriminate him is not enough under the Fifth Amendment; "his say-so does not of itself establish the hazard of incrimination." *Hoffman v. United States,* 341 U.S. 479, 486 (1950). On the basis of what was presented to it, the Court found that Mr. Higley had failed to "show a 'real danger,' and not a mere imaginary, remote or speculative possibility of prosecution" based on the information withheld. *In re Morganroth,* 718 F.2d 161, 167 (6th Cir.1983) (citations omitted); *see In re Sealed Case,* 825 F.2d 494, 497 (D.C.Cir.), *cert. denied, Roe v. United States,* 484 U.S. 963 (1987); *Steinbrecher v. C.I.R.,* 712 F.2d 195, 197 (5th Cir.1983).

Mr. Higley still has not offered any evidence that by revealing additional details about the location and disposition of investor funds he would incriminate himself any more than he already has by providing the information in the Joint Accounting. Unlike the other three individual defendants, Mr. Higley did not testify at the hearing on the motion to reconsider, and he provided no supplemental declarations or affidavits. His only additional argument, which is unsupported by any evidence, is his counsel's statement that "this is a case in which the SEC has alleged that the Bankers Alliance Defendants are operating a 'Ponzi scheme' and have materially misrepresented to investors the contemplated use of their funds." Memorandum in Support of Motion of Bankers Alliance Defendants For Reconsideration of Contempt Order, at 6. Contrary to counsel's view, it would require a great deal of judicial imagination to find that this statement alone presents "credible reasons" why revealing the information required by the Court's Preliminary Injunction presents more than a remote or speculative fear of further incrimination. *SEC v. Parkersburg Wireless Ltd. Liab. Co.,* 156 F.R.D. 529, 537 (D.D.C.1994); *see Ueckert v. C.I.R.,* 721 F.2d 248, 250 (8th Cir.1983).

Indeed, the new evidence that has come before the Court from other sources during the hearing on the motion to reconsider further supports the Court's conclusion that Mr. Higley has not expressed a nonfrivolous fear of self-incrimination or prosecution. Repeatedly during his testimony and in their declarations, Messrs. Nash, Lee and Finegan stated that they believe Mr. Higley knows where the

investor funds are located, that they have asked Mr. Higley to tell them where they are, and that Mr. Higley has repeatedly refused to reveal the information to them or to the Court-but not because of any fear of self-incrimination. Testimony of Allan Nash at Hearing on Reconsideration ("Nash Test."), Hearing Transcript ("Tr.") at 31-32, 74, 87; Testimony of Roy Lee at Hearing on Reconsideration ("Lee Test."), Tr. at 130, 132-35; Testimony of John Finegan at Hearing on Reconsideration ("Finegan Test."), Tr. at 357-58; Supplemental Declaration of Allan Nash ("Nash Supp.Decl.") at ¶¶ 6, 7; Supplemental Declaration of Roy Lee ("Lee Supp.Decl.") at ¶¶ 5, 6, 8, 11. Rather, Mr. Higley has consistently told Messrs. Lee and Nash that the reason he would not reveal the information is because he promised foreign investors that he would keep their identities secret. Nash Test., Tr. at 32, 41-42, 76; Lee Test., Tr. at 127, 134; Nash Supp.Decl. at ¶ 6; Lee Supp.Decl. at ¶ 5. Mr. Nash testified that Mr. Higley never raised his fear of potential criminal liability or self-incrimination as a reason for not revealing the location of investor funds. Nash Test., Tr. at 70.

**\*4** Furthermore, as the SEC points out, Mr. Higley's Fifth Amendment privilege would not be implicated by turning over records of bank accounts in Singapore that are under his possession, custody and control. Foreign bank records that have already been created are not privileged under the Fifth Amendment because their production is not testimonial in nature and the information they contain, and the records themselves, were not created involuntarily or by compulsion. *United States v. Doe,* 465 U.S. 611, 612-13 (1984); *see Doe v. United States,* 487 U.S. at 201, 206 (1988); *Braswell v. United States,* 487 U.S. 99, 108-10 (1988); *Commodity Futures Trading Comm'n v. Collins,* 997 F.2d 1230, 1233 (7th Cir.1993). The production of bank records can only be deemed inculpatory if the existence and location of the documents are unknown to the government or their production would implicitly authenticate the documents and thereby incriminate the person producing them. *Doe v. United States,* 487 U.S. at 208-218; *United States v. Doe,* 465 U.S. at 613-14; *In re Grand Jury Subpoena Duces Tecum,* 1 F.3d 87, 93 (2d Cir.1993), *cert. denied, Doe v. United States,* 114 S.Ct. 920 (1994). Mr. Higley has already divulged the existence and location of those records created by Citibank in Singapore relating to the Bankers Alliance defendants' Singapore accounts. Upon their

Not Reported in F.Supp.                                                                Page 4
Not Reported in F.Supp., 1995 WL 590665 (D.D.C.), Fed. Sec. L. Rep. P 98,717
(Cite as: Not Reported in F.Supp., 1995 WL 590665 (D.D.C.))

release, these documents would be authenticated by Citibank and not implicitly through their production by Mr. Higley. The Court therefore rejects as illegitimate Mr. Higley's invocation of the Fifth Amendment to justify his nondisclosure of the location and disposition of investor funds.

As to his failure to repatriate investor funds, Mr. Higley offers no additional evidence regarding impossibility of performance. Rather than demonstrating impossibility, the evidence that was presented to the Court at the hearing on reconsideration shows that Mr. Higley clearly could, but simply has been unwilling to, repatriate the investor funds. Mr. Higley is the man in control of the Bankers Alliance scheme and a signatory on at least four relevant Singapore bank accounts, as well as the assignee of a $5 million Certificate of Deposit from Lee Coy Traders. Joint Accounting at 3; Copy of Certificate of Time Deposit, Defendants' Exhibit No. 5 at Contempt Hearing. Messrs. Lee, Nash and Finegan all testified that Mr. Higley has told them repeatedly that he was taking care of repatriating the funds. Nash Test., Tr. at 34, 41-42, 75-76; Lee Test., Tr. at 153-55; Finegan Test., Tr. at 354, 358, 365-66. Indeed, Mr. Lee and Mr. Finegan continue to assert that they believe Mr. Higley is working on getting the funds repatriated and will do so soon. Lee Test., Tr. at 154-55; Finegan Test., Tr. at 365, 372. The Court does not have the faith in Mr. Higley that Messrs. Lee and Finegan have and does not believe that Mr. Higley will repatriate the funds absent the coercion of the Court's contempt power.

*5 The Court finds that the testimony before it from Messrs. Lee, Nash and Finegan-in conjunction with the adverse inferences the Court is free to draw from Mr. Higley's continued assertion of the Fifth Amendment [FN3]-shows that Mr. Higley knows where the investor funds are located and is capable of repatriating them. Accordingly, the Court will not reconsider its contempt order against Mr. Higley for violating the provisions of the Preliminary Injunction requiring him to provide information about the location and disposition of investor funds and to repatriate the investor funds. Because Mr. Higley has offered no reason whatsoever why he is unable either to disclose the information or to repatriate the funds, the Court finds that he is merely unwilling to comply with the Court's Order, not that compliance is impossible.

B. Bankers Alliance Corp., B.A. Holding Co., L.F.S. Lee Financial Services and Lee Financial Group, Ltd.

In its April 7, 1995, Order, the Court held defendants Bankers Alliance Corp., Lee Financial Group Ltd., L.F.S. Lee Financial Services, and B.A. Holding Co. in civil contempt because each of these entities signed the Joint Accounting through an agent, Mr. Higley for Bankers Alliance and Mr. Lee for each of the other defendants, and because each has failed to provide information or to repatriate funds as required by the Preliminary Injunction. In addition, the Court determined that defendant Higley could not invoke the Fifth Amendment privilege on behalf of Bankers Alliance because the Fifth Amendment privilege is not available to corporations, and an "individual cannot rely upon the privilege to avoid producing the records of a collective entity which are in his possession in a representative capacity, even if these records might incriminate him personally." *Bellis v. United States,* 417 U.S. 85, 88 (1974); *see Braswell v. United States,* 487 U.S. at 110.

The defendants have offered no evidence that provides the Court a basis to reconsider its finding with respect to Bankers Alliance Corp. and B.A. Holding Co.[FN4] The Court also rejects the argument that L.F.S. Lee Financial Services and Lee Financial Group, Ltd., should not be held in contempt because of their supposedly minimal involvement in the activities alleged in the complaint. According to Messrs. Nash and Lee, L.F.S. Lee Financial Services and Lee Financial Group are in the business of brokering loans. Nash Test., Tr. at 43-45; Lee Test., Tr. at 160-61, 163. Although both Mr. Nash and Mr. Lee have maintained that these two entities were not involved in the activities alleged in the complaint and that they were operated separately from Bankers Alliance,[FN5] the Court finds that the evidence presented has demonstrated that L.F.S. Lee Financial Services and Lee Financial Group were intimately involved in the allegedly fraudulent activities and were closely intertwined with Bankers Alliance.

The personnel for each entity overlapped; funds from one investor were directly deposited into an L.F.S. account (Lee Test., Tr. at 101); investor funds were transferred from B.A. Holding Co. and Bankers Alliance Corp. to accounts of L.F.S. Lee Financial

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                        Page 5
Not Reported in F.Supp., 1995 WL 590665 (D.D.C.), Fed. Sec. L. Rep. P 98,717
(Cite as: Not Reported in F.Supp., 1995 WL 590665 (D.D.C.))

and Lee Financial Group (Lee Test., Tr. at 180-81, 221-22); a check drawn on a Lee Financial Group account was used to pay for advertisements in the *Wall Street Journal* and the remitter on the check was Bankers Alliance Corp. (Lee Test., Tr. at 232-35); funds to refund $30,000 to Arnold Aloff that he had paid to L.F.S. Lee Financial to obtain a loan were paid out of a B.A. Holding Co. account (Lee Test., Tr. at 182-84, 207); and a fax cover sheet of Lee Financial Group was used to send out information for Bankers Alliance Corp. (Plaintiff's Exhibit No. 5 at Hearing on Reconsideration; Nash Test., Tr. at 46). Indeed, Mr. Lee could only identify $180,000 in the accounts of L.F.S. Lee Financial Services and Lee Financial Group that came from sources other than investors in the allegedly fraudulent scheme. *See infra* note 6. In sum, the testimony presented at the hearing on reconsideration makes plain that all of the entities were involved and used by Mr. Higley and Mr. Lee in the alleged scheme to defraud.

## III. ROY LEE, JOHN FINEGAN AND ALLAN NASH

### A. Roy Lee

**\*6** If Steven Higley was the mastermind behind the alleged fraudulent scheme, Roy Lee was his second-in-command. Mr. Lee is the President of L.F.S. Lee Financial Services, the President of Lee Financial Group, Ltd., a principal in B.A. Holding Co., and the Treasurer of Bankers Alliance Corp. Lee Decl. at ¶¶ 3-6. He recruited Allan Nash, who may have been an unsophisticated naif when it came to financial matters (though not quite as unsophisticated as he suggested to the Court), and he worked with Mr. Nash, John Finegan and other defendants in signing up investors and moving money from Nevada to Michigan to Singapore. While Mr. Lee has admitted that he has signatory authority over several relevant United States bank accounts and joint signatory authority over one of several relevant Singapore bank accounts (Lee Decl. at ¶¶ 7, 10; Joint Accounting at 2-3), in most other respects he has misrepresented to the Court in his declarations and his testimony where investor funds ultimately went and when, and the extent of his knowledge and control.

### 1. Mr. Lee's Failure To Account For Funds

At the hearing on reconsideration, Mr. Lee explained,

probably accurately, the first steps in the movement of investor funds in this country. According to his testimony, when an individual agreed to invest in the Bankers Alliance currency investment program, defendant Wayne Wakefield would have the investor open an account in his or her own name at Primerit Bank in Reno, Nevada, and deposit the minimum $200,000 investment in the account. Lee Test., Tr. at 100; *see also* Nash Test., Tr. at 29-30, 47, 50. After signing a contract with Bankers Alliance, usually through defendant Allan Nash, the investor would then be directed to transfer the funds from his or her account into another account at Primerit Bank in Reno, Nevada, in the name of B.A. Holding Co. The investor funds in the Nevada account would then be transferred to one of three accounts in Michigan: a BankOne account in the name of B.A. Holding Co., a Comerica account in the name of B.A. Holding Co., or a First of America account in the name of Bankers Alliance Corp. Lee Test., Tr. at 100; Lee Decl. at ¶ 7; Lee Supp.Decl. at ¶ 3; *see* Nash Supp.Decl. at ¶ 3.

Not all investor funds followed this same path to Michigan, however. Mr. Lee conceded that funds invested by Donald Anthony Villoni and Todd Kuhlman were transferred to an L.F.S. Lee Financial Services account instead of to a Bankers Alliance account or a B.A. Holding account. Lee Test., Tr. at 101-02; Joint Accounting at 10. On four other occasions investor funds were transferred directly from investor accounts to the Bankers Alliance account at First of America in Michigan. Lee Test., Tr. at 102. Whichever path the funds took to the Bankers Alliance defendants' accounts, all of the funds in the accounts of Bankers Alliance Corp. and B.A. Holding Co., and nearly all funds in the accounts of L.F.S. Lee Financial Services and Lee Financial Group, came from investors in conjunction with the fraudulent scheme alleged in the complaint. Lee Test., Tr. at 181-82, 190, 218.[FN6]

**\*7** Mr. Lee further testified that rather than being kept segregated and available for legitimate investment purposes, as advertised and as contemplated by the investors, the investor funds were used for a wide variety of purposes after they reached Michigan. While, according to Mr. Lee, approximately $2.5 million of the funds were transferred to two accounts in Singapore that ostensibly were to be used for conducting currency trading, Lee Test., Tr. at 111-12, other funds were

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 6
Not Reported in F.Supp., 1995 WL 590665 (D.D.C.), Fed. Sec. L. Rep. P 98,717
**(Cite as: Not Reported in F.Supp., 1995 WL 590665 (D.D.C.))**

transferred to other accounts, individuals and organizations that had little or nothing to do with the investment program.

For example, Mr. Lee acknowledged that $205,000 in an account at BankOne of the Lee Financial Group came from a Bankers Alliance account at First of America, part of which money was used to pay the *Wall Street Journal* for advertisements. Lee Test., Tr. at 180, 232-35. Mr. Lee also admitted to transferring approximately $275,000 from Bankers Alliance Corp. and B.A. Holding Co. accounts to a variety of other persons in this country: $9,200 to Eddie Smotherman to pay for services provided to Mr. Higley's grandmother (Lee Test., Tr. at 212-13); $10,000 to Charles Schwab as an advance for defendant Terry Plack (Lee Test., Tr. at 211); $15,000 to Michael Saliba as an advance on the future profits of the enterprise (Lee Test., Tr. at 239); $60,000 to Colhida Trading, purportedly to refund a deposit for a loan (Lee Test., Tr. at 239); $60,000 to Francis Lantz, who was a relative of Mr. Higley's, for unspecified purposes (Lee Test., Tr. at 211); $100,000 to Arnold Aloff, d/b/a Diamond Properties, Inc., for unspecified purposes (Lee Test., Tr. at 212); and $20,000 to Neo Rec, Inc., or Stanley Schwegler, for unspecified purposes (Lee Test., Tr. at 213).[FN7] On the basis of this evidence, the Court finds that Mr. Lee was aware of the location and disposition of these funds throughout these proceedings, but that he failed to divulge this information in the Joint Accounting or in his initial or supplemental declaration.[FN8]

Prior to this revealing testimony that investor funds remained in this country and were not used for the investment program, Mr. Lee had repeatedly stated to the SEC and to the Court that all investor funds had been transferred overseas. In his first declaration, he stated that all the "funds and assets received [from] investors were wire transferred" to one of three Michigan accounts and then to one of two Singapore accounts at Citibank. Lee Decl. at ¶ 7. He specifically outlined which investor's funds were transferred to which Michigan and Singapore accounts. *Id.* In his supplemental declaration, he stated that after investor funds were transferred to Michigan "[a]ll U.S. investor funds received relating to activities alleged in the complaint were transferred to the Citibank Singapore Accounts, except for the last transfer." Lee Supp.Decl. at ¶ 4. At the hearing on reconsideration,

Mr. Lee for the first time explained that what he really meant was that all investor funds, while not actually *transferred* to Singapore bank accounts, were credited on the books of Bankers Alliance for investment purposes and then "released" for other purposes in this country or elsewhere. He characterized this as Mr. Higley's "ledger balancing" system. Lee Test., Tr. at 103-08, 113-16.

**\*8** According to Mr. Lee, the "ledger balancing" system worked as follows: There was a Certificate of Deposit, presumably in Singapore or in some other overseas bank, in the amount of $5 million that would be drawn down in amounts equal to the amount of funds invested in the United States. Lee Test., Tr. at 105-08, 171-72. Mr. Lee testified that upon instructions from Mr. Higley, once the investor funds reached one of the Michigan accounts they would be "credited" against the Certificate of Deposit and would then be "released." In Mr. Lee's view, the investor funds "credited" to accounts in Singapore and "released" were no longer in the United States as investor funds. Thus, Mr. Lee urged that paragraph 4 of his supplemental declaration should have read as follows: "All U.S. investor funds received in the United States relating to activities alleged in the complaint were *ledger balanced* or *credited* on the books of Bankers Alliance in Singapore." *See* Lee Test., Tr. at 116-18. Mr. Lee also explained that he did not include in his declaration the disbursement of funds for the other purposes described above because he did not consider these other funds to be investor funds once they had been "ledger balanced" and "released." Lee Test., Tr. at 137, 146-47, 174-76. Mr. Lee was unable to tell the Court what funds supported the Certificate of Deposit lying behind the "ledger balancing" system. Lee Test., Tr. at 171-72.

Mr. Lee's explanation that he considered the deposits to be investor funds only up until the time Mr. Higley informed him that the funds had been "ledger balanced," and therefore were "released" and could be used in Mr. Higley's discretion and at his direction, either reflects an incredible level of gullibility on Mr. Lee's part or a serious attempt to mislead both the SEC and the Court. The Court does not accept the notion-and does not believe Mr. Lee could have either-that the funds ceased magically to be investor funds in the United States because Mr. Higley said so. As a consequence, the Court finds that Mr. Lee's repeated statements in his declarations

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                  Page 7
Not Reported in F.Supp., 1995 WL 590665 (D.D.C.), Fed. Sec. L. Rep. P 98,717
**(Cite as: Not Reported in F.Supp., 1995 WL 590665 (D.D.C.))**

that *all* funds had been "transferred" to Singapore were false and that he purposely misled the SEC and the Court. Nowhere else, not in the Joint Accounting or in any other papers submitted to the Court, has Mr. Lee or any of the other Bankers Alliance defendants mentioned or described the "ledger balancing" system. Lee Test., Tr. at 166-68.[FN9] The Court concludes that the "ledger balancing" system is a sham concocted by Mr. Lee and/or Mr. Higley, and that Mr. Lee may not hide behind it to justify his failure to account for funds that were not transferred to the Singapore Citibank accounts.[FN10]

The Court also rejects Mr. Lee's attempt to justify his failure to provide a full accounting by claiming that records necessary to effectuate compliance with the Preliminary Injunction are unavailable. If they are unavailable, it is because Mr. Lee has put them out of the reach of the Court-and his own reach-by intentionally taking them to Singapore and leaving them there with Mr. Higley, and because he has made insufficient efforts to retrieve them. In addition, Mr. Lee has access to bank account records in the United States and has failed adequately to demonstrate to the Court that he does not have access to at least one of the Citibank accounts in Singapore. Mr. Lee has not shown that it is impossible for him to obtain information regarding the location or disposition of investor funds in either Singapore or in the United States.

**\*9** While Mr. Lee admits that he is a joint signatory on one of the Citibank accounts in Singapore, he asserts that he does not have, and never had, "the power to determine the location or disposition of funds sent to the Citibank Joint Account." Lee Supp.Decl. at ¶ 6.[FN11] He testified that Mr. Higley told him that he did not need to have access to the information on the account and that, so far as Mr. Lee knew, he had no authority over the account other than to transfer money into it. Lee Test., Tr. at 127-28. Mr. Lee testified further that he had never seen a statement from the Citibank account, that he did not possess a bank book for the account and that he had no checks for the account. Lee Test., Tr. at 128-29. Mr. Lee maintains that although he is a joint signatory on the account, he has no power to obtain any information on the status of this account because he does not have "the validly authorized PIN number associated with this account. No information about that account will be released without the PIN number,

and no control over funds in that account can be exercised without the PIN number. Steven Higley has the sole control over that PIN number." Lee Supp.Decl. at ¶ 6.

Mr. Lee bases these assertions on the fact that in the fall of 1994 he contacted Citibank in Singapore to see if he could get account information to determine what happened to a particular transfer and was told by a bank representative that he could not get such information without the account PIN number that Mr. Higley possessed. Lee Supp.Decl. at ¶ 6; Lee Test., Tr. at 124-25. According to Mr. Lee, when he asked Mr. Higley for the PIN number, Mr. Higley refused to disclose it. Lee Supp.Decl. at ¶ 6; Lee Test., Tr. at 127. Yet, despite the entry of the Preliminary Injunction and the issuance of the contempt order by the Court, Mr. Lee has made no efforts to test the accuracy of what he allegedly was told by the Citibank employee in the fall of 1994 or to get the PIN number from Mr. Higley. While in Singapore in March of 1995, Mr. Lee did not contact Citibank regarding the records for the Citibank accounts, and he did not attempt to obtain the PIN number or any other information regarding the location of investor funds either from Citibank or from Mr. Higley. Lee Test., Tr. at 184-85, 194-95, 197. Mr. Lee has had no further contact with Citibank that shows any current unwillingness of Citibank to provide account information; indeed, he has not even provided or, so far as the evidence shows, sought to obtain, a letter from Citibank corroborating the need for a PIN number by one who is a joint account holder. Lee has offered no credible evidence why he cannot, as an account holder, request a copy of his bank records or other account documents. He simply continues to plead ignorance of any knowledge of the Citibank account.

Not only has Mr. Lee failed to provide information about the location and disposition of investor funds, he has also made it more difficult for the SEC to obtain such information. When Mr. Lee travelled to Singapore after the entry by the Court of the temporary restraining order in March of 1995, he took all the bank records relating to the United States accounts of the Bankers Alliance defendants with him and left them there with Mr. Higley. Lee Test., Tr. at 109-10. While Mr. Lee suggests that he left them so Mr. Higley could complete the preparation of the Joint Accounting and because Mr. Higley refused

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                                                     Page 8
Not Reported in F.Supp., 1995 WL 590665 (D.D.C.), Fed. Sec. L. Rep. P 98,717
(Cite as: Not Reported in F.Supp., 1995 WL 590665 (D.D.C.))

to let him bring them back to the United States, the Court does not find Mr. Lee's explanations for leaving the records in Singapore credible. *See* Lee Test., Tr. at 184-85. The Court finds that Mr. Lee intentionally left the records in Singapore where they would be out of reach of the SEC and the Court.[FN12] Thus, Mr. Lee not only has failed to attempt to cure his self-imposed ignorance of the location and disposition of investor funds, he has exacerbated it. By no stretch of the imagination has Mr. Lee shown a sufficient effort to comply with the Court Order or a demonstration of impossibility of performance.

*10 Finally, the consent directive that Mr. Lee has signed does not suffice to fulfill Mr. Lee's burden. The consent directive might assist the SEC in tracing where investor funds were disbursed and currently are located. But it is not the SEC's responsibility to comply with the Court's Order on Mr. Lee's behalf. Mr. Lee has an obligation to provide bank records and other information and to track down the funds that have been disbursed from the accounts of Bankers Alliance Corp., B.A. Holding Co., L.F.S. Lee Financial Services, and Lee Financial Group, Ltd., whether the funds were "released" or not, and whether they were transferred overseas or were disbursed in the United States. Mr. Lee must provide a sworn accounting of the location and disposition of investor funds, including an accounting of those transfers to and from the accounts identified by the SEC and listed in the attachment to the Order accompanying this Opinion.

2. Mr. Lee's Failure to Repatriate Investor Funds

The Court also finds unconvincing Mr. Lee's arguments that it is impossible for him to repatriate investor funds. Mr. Lee is the President of Lee Financial Services, the President of L.F.S. Lee Financial Group, Ltd., a principal of B.A. Holding Co. and the Treasurer of Bankers Alliance Corp. Lee Decl. at ¶¶ 3-6. He also helped found Lee Coy Traders, which was set up in Singapore as the entity through which Bankers Alliance investment transactions would be conducted.[FN13] Finegan Test., Tr. at 339-42. All of these entities were involved in the investor program, Mr. Lee was a signatory on the accounts of each of these entities, and he controlled the transfer of funds from the United States accounts of each of these entities. Accordingly, the Court finds that Mr. Lee has not shown that it is impossible for

him to repatriate funds.

In addition, Mr. Lee has acknowledged that the Singapore account over which he has joint signatory authority currently has $35,000 in it. Lee Supp.Decl. at ¶ 6; Lee Test., Tr. at 125. Yet he has provided no evidence that he has made any efforts to obtain these funds or (except for his own incredible statements) that he is unable to obtain the funds. Lee Test., Tr. at 125, 200-01. His excuse that Mr. Higley controls the account is unavailing because Mr. Lee has made insufficient inquiries about the account or any attempts to obtain information on or funds from the account.

With respect to investor funds "released" in the United States and transferred to locations other than the Citibank accounts in Singapore identified in the Joint Accounting, Mr. Lee has not shown that it is impossible for him to obtain these other funds. His testimony demonstrates that he has made no effort to secure the return of these funds. To purge his contempt, Mr. Lee must use his "best efforts to restore all the funds disbursed from" any accounts of the Bankers Alliance defendants. *SEC v. Current Financial Services, Inc.,* 798 F.Supp. at 808. Specifically, Mr. Lee must attempt to obtain the funds transferred to Shekeb Weldingwala, Francis Lantz, Arnold Aloff, Neo Rec, Stanley Schwegler, Robin Marie Felde, or any other individual or entity that may have received funds that originated from the Bankers Alliance defendants' accounts. Mr. Lee must either repatriate these funds or demonstrate "categorically and in detail" that he has attempted to but is unable to obtain these investor funds, including those transferred from the accounts identified by the SEC and listed in the attachment to the Order accompanying this Opinion. *Id.*[FN14]

3. Mr. Lee's Misplaced Reliance on Mr. Higley

*11 Mr. Lee has sought to characterize his own conduct in this matter and his inability to comply with the Court's Order as completely controlled by the elusive and unavailable Mr. Higley. He has stated that investor funds were transferred only upon Mr. Higley's direction (Lee Supp.Decl. ¶ 3; Lee Test., Tr. at 207-08), and that Mr. Higley had control of the investor funds in Singapore and control of any information about the funds once transferred overseas. Lee Test., Tr. at 97, 109, 130, 132-35.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                  Page 9
Not Reported in F.Supp., 1995 WL 590665 (D.D.C.), Fed. Sec. L. Rep. P 98,717
(Cite as: Not Reported in F.Supp., 1995 WL 590665 (D.D.C.))

Indeed, even when he agreed to provide an accounting and to repatriate investor funds by consenting to and signing the Preliminary Injunction, Mr. Lee says he had no intention of providing the required information or repatriating the funds, and no ability to do so.

Mr. Lee relied entirely on Mr. Higley to comply with the Court's Order to provide an accounting, at least with respect to the Singapore accounts-and apparently also with respect to the United States accounts, since Mr. Lee left the records of those accounts with Mr. Higley in Singapore. Lee Test., Tr. at 109-10. After entry of the contempt order, the only step Mr. Lee made to learn where the funds were located was to ask Mr. Higley for further access to and information about the Singapore accounts. Mr. Higley allegedly said he was not going to reveal their locations because of concerns about confidentiality, and Mr. Lee left it at that. Lee Supp.Decl. at ¶ 5; Lee Test., Tr. at 132-35.

After signing the Preliminary Injunction, Mr. Lee says he spoke with Mr. Higley on a daily basis and was assured by Mr. Higley that he was going to repatriate the funds. Lee Test., Tr. at 132, 153-54. After the Court cited the Bankers Alliance defendants for civil contempt, Mr. Lee testified that Mr. Higley stated that he was working on repatriating the money and would have the funds back in the United States by the time required in the contempt order. Lee Test., Tr. at 154-55. Mr Lee testified that there is nothing else he can do to repatriate the funds besides speaking with Mr. Higley and that he still believes Mr. Higley will repatriate the funds. Lee Test., Tr. at 154-55.

Mr. Lee may not continue to rely on Mr. Higley's asserted promises to provide the information requested or to repatriate funds. Even if Mr. Lee's testimony were totally credible-and the Court finds that it is not-Mr. Lee must know by now that his reliance on Mr. Higley has been misplaced, particularly since Mr. Higley is now refusing to provide any additional information on the location of investor funds and, despite repeated promises, has not repatriated funds. Mr. Lee must fulfill his own independent obligations under the Court's Order to provide information about the location and disposition of investor funds and to repatriate them. The Court does not find Mr. Lee's pleas of current impossibility to be credible. It is inconceivable that Mr. Lee, who appears to be the main United States operative of the Bankers Alliance defendants, does not know or cannot find out what happened to the investor funds or that he cannot repatriate those funds. He has failed to meet his burden of showing impossibility of compliance.

### B. John Finegan

*12 When the issue of civil contempt was first before the Court, John Finegan-like Mr. Higley, firmly ensconced in Singapore-invoked his Fifth Amendment privilege against self-incrimination. According to Mr. Finegan, he did so on the advice of counsel and on the advice of Mr. Higley. In addition, unlike the other Bankers Alliance defendants, Mr. Finegan had not signed the Joint Accounting submitted to the Court and therefore was in contempt of Paragraph VII of the Preliminary Injunction in its entirety, not just portions of it. At the proceedings before the Court on April 20, 1995, Mr. Nash testified that Mr. Finegan had just returned from Singapore and was now in Michigan. Nash Test., Tr. at 70-71. On April 24, 1995, counsel confirmed this fact and represented to the Court that Mr. Finegan now wanted to testify on the issue of impossibility. The Court agreed to hear testimony from Mr. Finegan on April 26, 1995. Subsequently, on April 28, 1995, Mr. Finegan belatedly submitted his own accounting to the Court.

According to Mr. Finegan, he has been working since 1991 (with a hiatus for several months in 1993-94) as an unpaid trainee for Steven Higley-watching, learning, listening and taking notes-to learn all he could about the investment business and the world of rich and influential people in which Mr. Higley operated. Finegan Test., Tr. at 312-15, 317-19. He worked for Mr. Higley in Michigan, Chicago and Singapore, moving from place to place at Mr. Higley's request. Mr. Finegan earned no salary, but Mr. Higley paid his rent, paid for his food and took care of other expenses for Mr. Finegan and his four-year old son. Finegan Test., Tr. at 318, 323. At times Finegan even lived with Mr. Higley. Finegan Test., Tr. at 317. In the summer of 1994, Mr. Finegan began doing "market research" for Mr. Higley, contacting people by telephone whose names and phone numbers Mr. Nash gave him. Those whom he called had responded to advertisements in the *Wall*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                  Page 10
Not Reported in F.Supp., 1995 WL 590665 (D.D.C.), Fed. Sec. L. Rep. P 98,717
**(Cite as: Not Reported in F.Supp., 1995 WL 590665 (D.D.C.))**

Street Journal or in USA Today and some became investors in the Bankers Alliance currency trading program. Finegan Test., Tr. at 323-25.

Mr. Finegan testified that defendant Wayne Wakefield dealt with the investors initially, Mr. Nash filled out the investor contracts (on forms that Mr. Higley had drafted and designed), and Mr. Finegan verified the sources of the investor funds and answered questions asked by the investors over the telephone. Finegan Test., Tr. at 328-30. Mr. Finegan was described on the contracts as "agent to the underwriter," a term which he testified he did not understand. Finegan Test., Tr. at 332. Mr. Higley told Finegan he wanted him to sign the investor contracts because he at least had talked to the investors, but instead, with Mr. Finegan's approval, Mr. Nash signed Mr. Finegan's name to the contracts. Finegan Test., Tr. at 330-31.

Mr. Finegan testified that he did not know where the money went after an investor signed a contract. He knew only that somehow it was transferred to a Reno, Nevada, bank account and from there to an account in Detroit, Michigan. Finegan Test., Tr. at 332. On two occasions, he participated in conversations with Mr. Lee and Mr. Higley in which he heard that the money then went to Citibank in Singapore. Finegan Test., Tr. at 335-37. He testified that he did not know any details regarding any of the bank accounts. Mr. Higley did tell Finegan, however, that he, Mr. Lee, Mr. Nash and Supaya Sio Ayaro created Lee Coy Traders-Lee for Roy Lee and Coy for Steven Coy Higley-through which investor funds would be placed, leveraged and traded through a Citibank Singapore account. Finegan Test., Tr. at 339-42. Mr. Finegan testified that he has no access to information regarding the Lee Coy Traders account or any other Singapore bank accounts. Finegan Test., Tr. at 342-43.

**\*13** Mr. Finegan testified that he was in Singapore with Mr. Higley from November 1994 until Easter Sunday, April 16, 1995. He stated that he was to be trained to oversee the currency trading of Bankers Alliance. Finegan Test., Tr. at 345-46. He attended numerous meetings with Mr. Higley and people from all over the world who had come to Singapore to discuss investment opportunities with Mr. Higley. Finegan Test., Tr. at 348, 350-52. Again, Mr. Finegan was not paid, but Mr. Higley paid all of Mr. Finegan's

expenses. Finegan Test., Tr. at 354-55. Mr. Finegan was in Singapore with Mr. Higley when the SEC investigation began and when the Court entered the Temporary Restraining Order on March 2, 1995.

Mr. Finegan testified that he had no knowledge of the location and disposition of investor funds and that he never has had such knowledge. He also testified that he has no control of the funds or the ability to repatriate them. According to Mr. Finegan, he consented to and signed the Preliminary Injunction because Mr. Higley assured him he would repatriate the funds and because Mr. Higley directed him to sign it. Finegan Test., Tr. at 357-58, 365-66. Mr. Finegan said he never tried to learn from Mr. Higley or anyone else where the funds were located except on two occasions when he asked Mr. Higley. Finegan Test., Tr. at 358-59. According to Mr. Finegan, on one occasion Mr. Higley responded: "It's none of your business where the funds are.... Just do what I tell you to do and if I tell you to go to court, you go to court. If I tell you to stay in Singapore, you stay in Singapore." Finegan Test., Tr. at 359.

The Court does not credit Mr. Finegan's assertions that he was Mr. Higley's dupe, unaware and unknowing about the goings-on of the Bankers Alliance investment scheme. He was with Mr. Higley almost constantly for days or weeks at a time, sometimes living in the same apartment or condominium. Mr. Finegan was privy to numerous conversations between Mr. Higley and others regarding Mr. Higley's activities in Singapore and the activities of Bankers Alliance and Lee Coy Traders. Indeed, despite downplaying his involvement, he appears to have played a significant role in the activities. By contacting potential investors and conducting "market research," he held himself out as the main marketing contact at Bankers Alliance and the primary contact for questions from the investors. Finegan Test., Tr. at 323-25, 329, 352. Mr. Finegan also acknowledged that he was a signatory on a Lee Financial Group bank account. Finegan Test., Tr. at 380; see Accounting of John P. Finegan, at 2. He also admitted telling investors over the telephone that he was the trader for Bankers Alliance and would be doing the trading on their behalf, even though he was not a trader. Finegan Test., Tr. at 399-400.

On cross-examination, Mr. Finegan acknowledged that he was listed as a trustee on a Bankers Alliance

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 590665 (D.D.C.), Fed. Sec. L. Rep. P 98,717
(Cite as: Not Reported in F.Supp., 1995 WL 590665 (D.D.C.))

business card but said that he never saw or used the card; indeed, his last name was misspelled on the card. Finegan Test., Tr. at 377-78; Plaintiff's Exhibit No. 12 at Hearing on Reconsideration. He speculated that Mr. Nash may have included his card in the package sent to investors. Finegan Test., Tr. at 379-80. Mr. Finegan stated that he had not previously had any opportunity to deny that he was a trustee prior to the April 26, 1995, hearing and that he was unaware of his title as trustee until then. Finegan Test., Tr. at 407-08, 431-32. His testimony on this issue, however, is belied by the deposition testimony of one of the investors, Fred Rumack, who stated under oath that Mr. Finegan told him that he was in fact a trustee of Bankers Alliance and that there were 34 or 35 other trustees. Deposition of Fred Rumack ("Rumack Dep."), Plaintiff's Exhibit No. 19 at Hearing on Reconsideration, at 64.

**\*14** Mr. Rumack's testimony also undermines Mr. Finegan's testimony concerning his limited knowledge and involvement in numerous other respects. For example, Mr. Rumack testified that Mr. Finegan told him that the Bankers Alliance companies had branches all over the world and worked in conjunction with each other (Rumack Dep. at 39); that Bankers Alliance had contracts with 18 to 24 governments, which allowed it to acquire the currency of those governments at a discount (*id.* at 40, 122); that Bankers Alliance had numerous already-existing credit lines, "significant credit lines," with major banks (*id.* at 50); that Mr. Rumack could obtain his money back on 30 days' notice (*id.* at 82-83); and that Mr. Finegan not only was a trader but that he already had been involved in some trades (*id.* at 88). Another investor, David G. Stauffacher, also testified that Mr. Finegan told him he was going to be doing the trading, while investor Richard Kenall testified that Mr. Finegan told him that he was the "main trader" for Bankers Alliance. Deposition of David G. Stauffacher, Plaintiff's Exhibit No. 16 at Hearing on Reconsideration, at 33; Deposition of Richard Kenall, Plaintiff's Exhibit No. 17 at Hearing on Reconsideration, at 43.

The Court concludes that either Mr. Finegan was lying about his roles when he spoke to investors and identified himself as a marketing representative, trustee and trader for Bankers Alliance, or he was lying during his testimony in Court when he tried to portray his responsibilities with Bankers Alliance as

limited and himself as lacking in knowledge. In either case, the Court finds that Mr. Finegan has been less than forthcoming with the Court and therefore finds that Mr. Finegan's testimony lacks credibility with respect to his statements regarding his inability to provide information about the location and disposition of investor funds.

Mr. Finegan's credibility is further undermined by the nonchalance with which he has taken his obligations under the Court's Preliminary Injunction. While he provided some information to Mr. Higley and Mr. Lee so they could prepare the Joint Accounting-he testified that he only verified the names of the investors and ranked them chronologically according to when they became investment partners-he said he was sleeping while the others were working on the Joint Accounting and forgot to sign it before it was sent from Singapore for filing with the Court. Finegan Test., Tr. at 355-56, 419-20. He testified, "I generally just forgot.... I didn't even give it a second thought." Finegan Test., Tr. at 355. Even though he was held in contempt of court for failure to provide the required information on April 7, 1995, Mr. Finegan testified that his failure to sign the Joint Accounting never crossed his mind from March 13, 1995 (the day the others signed it) until he was told by defendants' counsel that he had failed to sign it. Finegan Test., Tr. at 355-56. He "finally got around to reading" the Joint Accounting the night before he testified on April 26, 1995. Finegan Test., Tr. at 373-74. His failure to sign the Joint Accounting at all and to take the other provisions of the Court's Preliminary Injunction seriously constitutes contumacious conduct.

**\*15** Mr. Finegan's presence in Singapore for nearly six months and his participation in meetings and discussions with Mr. Higley, Mr. Lee, Mr. Nash, Hisham Hayousio, Wayne Wakefield, Michael Saliba, Michael Daily, and "individuals from different countries that flew in and wanted to do business with Mr. Higley," show that he was in a unique position among the defendants, excepting Mr. Higley, to be able to add important details to the narrative regarding the disposition of the investor funds that had been transferred to Singapore. Finegan Test., Tr. at 350; *see* Tr. at 348, 352.[FN15] Mr. Finegan intimated during his testimony that he could provide the names of individuals with whom he and Mr. Higley met and who may have connections to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 590665 (D.D.C.), Fed. Sec. L. Rep. P 98,717
(Cite as: Not Reported in F.Supp., 1995 WL 590665 (D.D.C.))

Page 12

foreign-controlled joint ventures with which investor funds presumably lie. Finegan Test., Tr. at 352, 360, 368. Because he has yet to provide such details, however, including in the accounting that he belatedly filed, he has failed to purge his contempt. He and his accounting stop short of providing any information regarding the location of the investor funds, information to which he has failed to show he does not have access to or does not actually possess.

Furthermore, there are steps that Mr. Finegan could take to attempt to comply with the Court's Order that he has admitted he has not taken. For example, he did not ask foreign investors where the funds were. Nor did he ask Mr. Ayaro where they were, even though he knew Mr. Ayaro was the majority owner of Lee Coy Traders, which was held out as being the trading account of Bankers Alliance. Finegan Test., Tr. at 340-41. He testified that he saw Mr. Ayaro on almost a daily basis and did not know whether Mr. Ayaro knew where the funds were, but "just never bothered to ask [him], because Mr. Higley kept saying that he's going to send the funds back...." Finegan Test., Tr. at 360-61. He also has not provided any information regarding the "managing trading account" where the funds were purportedly transferred for "asset management." Finegan Test., Tr. at 402. Until he has taken these steps and others, he remains in contempt. With respect to his obligation to provide an adequate accounting, the Court concludes that Mr. Finegan has failed to purge his contempt or to produce evidence that demonstrates "categorically and in detail" that it is impossible for him to comply with the Court's Order. *SEC v. Current Financial Services, Inc.*, 798 F.Supp. at 808.

With respect to Mr. Finegan's obligation to repatriate funds, the Court finds that while the SEC has shown by clear and convincing evidence that Mr. Finegan has not complied with Paragraph VIII of the Preliminary Injunction, the Court also finds that Mr. Finegan is not capable of complying. Mr. Finegan did not sign the investor contracts and there is no evidence that he in fact acted as a trader or managed investor accounts despite what he may have said to others. Furthermore, since he no longer is asserting his Fifth Amendment privilege, the Court cannot draw an adverse inference of control over the funds from his silence and consider it in conjunction with the very meager evidence in the record that he has any control over investor funds.

*16 Unlike Mr. Lee, who is a signatory on the United States accounts of the Bankers Alliance defendant entities and on an account in Singapore and who controlled the disposition of funds in the United States, and unlike Mr. Higley, who, at a minimum, controlled and controls the funds transferred to Singapore, no evidence shows that Mr. Finegan had any control over investment funds. In addition, although the Court has largely not credited the testimony of Mr. Lee, his testimony does support Mr. Finegan's statements that no amount of effort on Mr. Finegan's part could lead to their repatriation. Lee Test., Tr. at 241. Upon reconsideration and on the basis of the evidence presented to it, the Court therefore finds that Mr. Finegan has shown that he cannot comply with the Court's Order to repatriate investor funds.

### C. Allan Nash

Allan Nash is Vice President of L.F.S. Lee Financial Services, Vice President of Lee Financial Group, Ltd., and Secretary of Bankers Alliance Corp. Nash Decl. at ¶¶ 3-5. Mr. Nash testified at the hearing on the motion to reconsider to a limited role in the activities alleged in the complaint and said that his responsibilities with the entities was entirely administrative or ministerial. Nash Test., Tr. at 25; Nash Supp.Decl. at ¶ 2. He said that he was only responsible for maintaining and preparing documents, picking up mail, answering the telephone and retrieving messages from the organizations' answering service. Nash Test., Tr. at 25, 81. He stated that he took down information from potential investors in order to prepare documents, including investor contracts, and sent documents related to the currency trading to places where Mr. Lee or Mr. Higley told him to send them. Nash Test., Tr. at 25, 81; Nash Supp.Decl. at ¶ 2. While he also testified that he assisted in drafting certain cash forward receipts as an agent for Bankers Alliance Corp., acknowledging the receipt of $200,000 from one investor (Cash Forward Receipt, Defendants' Exhibit No. 3 at Hearing on Reconsideration), he suggested that the Court should not take his signature on cash forward receipts as showing any additional involvement because, he said, he did not personally receive the funds, had no specific understanding of what would be done with the funds, signed the document only because Mr. Higley directed him to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 13
Not Reported in F.Supp., 1995 WL 590665 (D.D.C.), Fed. Sec. L. Rep. P 98,717
(Cite as: Not Reported in F.Supp., 1995 WL 590665 (D.D.C.))

do so, and was not held out as an individual who would have any involvement in managing or investing the funds. Nash Test., Tr. at 36-38; Nash Supp.Decl. at ¶ 9.

Mr. Nash testified that he knew the location of the funds when they were in the B.A. Holding account in Reno, Nevada. Nash Test., Tr. at 29. He also stated that he knew that the funds were then transferred to accounts in Michigan, but he said he does not know which accounts. He said he understood from Mr. Lee and Mr. Higley that the funds were then transferred to accounts in Singapore, although he asserts that he does not know the specific accounts to which they were transferred. Nash Test., Tr. at 30. Mr. Nash said he had no signatory power over the accounts of Bankers Alliance defendant entities and no responsibility for transferring funds between or from those accounts. Nash Test., Tr. at 25-26, 28, 37. Mr. Nash said he did not know that any investor funds were dispersed or located in the United States. Nash Test., Tr. at 32-33. In short, Mr. Nash asserts that his specific knowledge of the whereabouts of the investor funds ended when they left Nevada. Nash Test., Tr. at 50.

*17 Mr. Nash testified that he signed the Preliminary Injunction even though he knew he could not comply with the Court's Order. He did so, he said, because he believed he was signing it in a joint capacity and that his codefendants, particularly Mr. Higley, would provide the full accounting and repatriate the funds. Nash Test., Tr. at 31-32, 42; Nash Supp.Decl. at ¶¶ 7, 12.

The Court finds that Mr. Nash has not been forthcoming with the SEC or with the Court. The testimony of Mr. Finegan indicates that Mr. Nash was more involved with the business of the Bankers Alliance entities than he would have the Court believe. For example, when the SEC asked Mr. Nash "What is Lee Coy Traders?" Mr. Nash responded "I don't know." When the SEC asked him "Do you know why it received investor money?" he stated "No, I don't." Nash Test., Tr. at 80. He also suggested that he did not know Mr. Ayaro and had only a vague understanding of Mr. Higley's business dealings with him. Nash Test., Tr. at 79. Mr. Finegan revealed during his testimony, however, that Mr. Nash travelled to Singapore for two weeks in the fall of 1994 (a trip that Mr. Nash did not mention in his

testimony) to set up Lee Coy Traders with Messrs. Higley, Lee and Ayaro, and that Messrs. Higley, Lee and Nash are all officers of the company whose names are on the corporate documents. Finegan Test., Tr. at 339-42.

The Court also does not believe Mr. Nash's statement that he was unaware of investor funds being transferred to locations in the United States. Mr. Nash admitted to knowing that certain entities and individuals in the United States received funds from Bankers Alliance or B.A. Holding Co. accounts. Nash Test., Tr. at 55-57, 61-62. Because the Court has concluded that the "ledger balancing system" is a concoction aimed at explaining away defendants' misuse of investor funds, and because defendants have not shown that the funds in the Bankers Alliance or B.A. Holding Co. accounts came from anywhere other than from investors, Mr. Nash must have known that the funds transferred to these entities and individuals were investor funds.

Because of his lack of candor, the Court concludes that it is unable to rely on Mr. Nash's statements with respect to his attempts to purge his contempt. Mr. Nash has failed to prove impossibility with respect to providing information regarding the location and disposition of investor funds in the United States. Mr. Nash must use his best efforts to locate and account for funds that were disbursed in the United States, and he has not yet done so. *SEC v. Current Financial Services, Inc.,* 798 F.Supp. at 808.

On the basis of the evidence presented to it, the Court does find, however, that Mr. Nash is unable to repatriate investor funds. Mr. Nash has no signatory authority over the accounts of the Bankers Alliance entities and he exerted no control over the transfer of funds. Like Mr. Finegan, therefore, Mr. Nash is in a different position from Messrs. Lee and Higley. In addition, the testimony of Messrs. Lee and Finegan comports with Mr. Nash's testimony that no amount of effort on Mr. Nash's part could lead to his being able to retrieve investor funds. Lee Test., Tr. at 131, 154; Finegan Test., Tr. at 365-66; Nash Test., Tr. at 42-43. Accordingly, upon reconsideration, the Court finds that Mr. Nash has shown that he is unable to comply with the Court's Order to repatriate investor funds.

IV. CONCLUSION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 14
Not Reported in F.Supp., 1995 WL 590665 (D.D.C.), Fed. Sec. L. Rep. P 98,717
(Cite as: Not Reported in F.Supp., 1995 WL 590665 (D.D.C.))

*18 The Court concludes that defendants Bankers Alliance Corp., Lee Financial Group, Ltd., L.F.S. Financial Services, B.A. Holding Co., Steven Higley, and Roy Lee remain in contempt of the Court's Order of March 13, 1995, requiring them to account for the location and disposition of funds raised from investors and to repatriate those funds. These defendants have failed to show their inability to comply with the Court's Order. They are directed to comply immediately with Paragraphs VII.(d) and VIII of this Court's Preliminary Injunction.

Defendants John Finegan and Allan Nash remain in contempt of the Court's Order of March 13, 1995, requiring them to account for the location and disposition of investor funds. Messrs. Finegan and Nash have shown that they are unable to comply with the Court's Order requiring them to repatriate the funds raised from investors, but have not made the requisite showing of impossibility with respect to the Court's Order requiring an accounting. Messrs. Finegan and Nash are directed to comply immediately with Paragraph VII.(d) of this Court's Preliminary Injunction.

As to defendants Bankers Alliance Corp., Lee Financial Group, Ltd., L.F.S. Financial Services, B.A. Holding Co. and Steven Higley, the Court has been given no reason to modify the sanctions previously imposed in its Order of April 7, 1995. Therefore, commencing on the date of the Order accompanying this Opinion, each of these defendants shall pay a fine of $25,000 per day for the first five days after the date of entry of the Order, $50,000 per day for the next five days, $75,000 per day for the next five days, and $100,000 per day until such time as they purge their contempt or until further order of the Court. In addition, Mr. Higley shall be arrested and incarcerated until he has complied with the Court's Order because he has the most to offer regarding the location of the investor funds and is in a position to repatriate the funds.

Although they have failed to purge their contempt, Messrs. Lee, Finegan and Nash presented evidence showing that different sanctions are appropriate with respect to each defendant to effectuate compliance with the Court's Order. Unlike Mr. Higley, defendants Lee, Nash and Finegan have each demonstrated that they have limited funds and a limited ability to raise the money necessary to pay the fines imposed by the Court on April 7, 1995. Accordingly, lesser fines that shall also incrementally increase will be imposed on these defendants until they have purged their contempt. In addition, while the Court concludes that each of them should be incarcerated until they purge themselves of contempt, the timing and the terms of the incarceration of each defendant shall be different to reflect the SEC's and the Court's expectations of what each defendant must still do to comply with the Court's Order.

Commencing on the date of entry of the Order accompanying this Opinion, defendant Roy Lee shall pay a fine of $100 per day for the first five days after the entry of the Order, $150 per day for the next five days, $200 per day for the next five days and $250 per day until such time as his contempt is purged or until further order of the Court. Mr. Lee shall be arrested and remain incarcerated in the District of Columbia Jail until he provides sufficient information regarding the location of the investor funds and either repatriates the funds or proves that he is unable to do so.

*19 Commencing on the date of entry of the Order accompanying this Opinion, defendants Allan Nash and John Finegan shall pay a fine of $50 per day for the first five days after the entry of the Order, $75 per day for the next five days, $100 per day for the next five days and $150 per day until such time that their contempt is purged or until further order of the Court. Messrs. Finegan and Nash will not be incarcerated at this time, but will be incarcerated ten days from the date of the Order, upon further motion of the SEC, if they have not purged themselves of the contempt.

For the forgoing reasons, the Motion of the Bankers Alliance Defendants for Reconsideration of Contempt Order is GRANTED IN PART and DENIED IN PART. An Order and Arrest Warrants will be issued this same day.

SO ORDERED

> FN1. Paragraph VII of the Preliminary Injunction ordered the defendants "and each of them" by March 13, 1995, to serve upon the Commission a sworn accounting for the period from January 1, 1990, to the date of the accounting. The accounting was to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 590665 (D.D.C.), Fed. Sec. L. Rep. P 98,717
(Cite as: Not Reported in F.Supp., 1995 WL 590665 (D.D.C.))

include, *inter alia,*

    d. all funds received from investors, partners, associate partners, or any other person in connection with the activities alleged in the complaint, including a list of:

    (i) the name, address, and telephone number of each investor, partner, or associate partner; and

    (ii) the amount invested by each investor, partner, or associate partner and *a statement of the location and disposition of any funds* received from investors, partners, associate partners, or other person; ... (emphasis added)

Paragraph VIII ordered that the defendants, "and each of them,"

    a. will, no later than March 20, 1995, or on such other date as the Commission shall agree, repatriate to the territory of the United States all funds and assets of United States investors, partners, or associate partners which are held by them or are under their direct or indirect control, jointly or singly, and deposit such funds into the registry of the United States District Court for the District of Columbia; and

    b. provide the Commission and the Court a written description of the funds and assets so repatriated.

FN2. The Court provided a full picture of the activities leading to this lawsuit and to the contempt citation in the Court's opinion of April 7, 1995, supporting its Order citing the defendants for civil contempt, and will not repeat the details here. *See SEC v. Bankers Alliance Corp., et al.,* No. 95-0428, slip op. at 2-9, 11-21 (D.D.C. April 7, 1995).

FN3.*See Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976); *Arcadia Woman's Health Center v. Operation Rescue,* 929 F.2d 530,

532 (9th Cir.1991); *SEC v. International Loan Network, Inc.,* 770 F.Supp. 678, 695-96 (D.D.C.1991).

FN4. Bankers Alliance Corp., which also does business as B.A. Holding Co., is presumably involved in foreign investments, particularly in the trading of currencies. Lee Test., Tr. at 95; Nash Test., Tr. at 24. The name B.A. Holding Co. was used to set up certain accounts at Nevada banks because, according to Messrs. Lee and Nash, Nevada does not allow the use of the word Bankers in bank account names. Lee Test., Tr. at 96; Nash Test., Tr. at 26.

FN5.*See* Declaration of Roy Lee ("Lee Decl.") at ¶¶ 3-4; Declaration of Allan Nash ("Nash Decl.") at ¶¶ 3-4; Nash Test., Tr. at 43-46; Lee Test., Tr. at 161-63, 198.

FN6. The only funds that Mr. Lee could identify in the L.F.S. Lee Financial Services or Lee Financial Group accounts that came from sources other than investors, was $30,000 from Arnold Aloff, who provided the money as a deposit for obtaining a loan (the $30,000 later was refunded to Mr. Aloff from a B.A. Holding account), Lee Test., Tr. at 182-84, 207; and $150,000 that L.F.S. recovered in a lawsuit in 1994, Lee Test., Tr. at 190.

FN7. The SEC has provided information that funds were transferred to other locations, including $400,000 from a BankOne account of B.A. Holding to an account in Singapore in the name of Shekeb Weldingwala, a partner of Mr. Higley's in Singapore, for unspecified purposes (Declaration of Jonathan I. Golomb ("Golomb Decl.") at ¶ 7; *see* Lee Test., Tr. at 174-75, 180, 242); and $25,000 from a BankOne account of Bankers Alliance Corp. to an account of Shekeb Weldingwala, as well as $10,000 to an account of Robin Marie Felde, who was a relative of Mr. Higley (Golomb Decl. at ¶ 10; *see* Nash Test., Tr. at 61-62).

FN8. Nor was this information divulged in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 590665 (D.D.C.), Fed. Sec. L. Rep. P 98,717
**(Cite as: Not Reported in F.Supp., 1995 WL 590665 (D.D.C.))**

the initial or supplemental declaration of Allan Nash or in the declaration of Steven Higley or John Finegan.

FN9. Mr. Finegan testified that he had heard of "leverage balancing"-not "ledger balancing"-on two different occasions in conversations with Mr. Lee and Mr. Higley, but he said he did not understand what it was. Finegan Test., Tr. at 335-36, 343.

FN10. Mr. Lee first mentioned the "ledger balancing" system after he was confronted with bank statements, cancelled checks and other information provided by the SEC in its response to the motion of the Bankers Alliance defendants for reconsideration, filed on April 19, 1995, showing the actual disbursements of investor funds.

FN11. Mr. Higley is a joint signatory with Supaya Sio Ayaro, who is not a defendant in this action, on a second Singapore account. Joint Accounting at 3. Defendants' currency trading was to be done out of two Lee Coy Traders accounts at Citibank, those on which Mr. Higley was a cosignatory with either Mr. Lee or Mr. Ayaro. *SEC v. Bankers Alliance Corp., et al.,* No. 95-0428, slip op. at 19-20 (D.D.C. April 7, 1995).

FN12. Furthermore, Mr. Lee has made minimal efforts to obtain duplicates of the bank records in the United States and has not even attempted to obtain the records at the headquarters of banks, where he was told he could secure them. Lee Test., Tr. at 189, 194.

FN13. According to Mr. Finegan, Messrs. Lee and Nash traveled to Singapore for two weeks in the fall of 1994. While there, they assisted Mr. Higley and Mr. Ayaro to set up Lee Coy Traders. Mr. Finegan testified that Messrs. Lee, Nash, Higley and Ayaro appear as officers on the official Singaporean document setting up, or incorporating, the entity. Lee Coy Traders allegedly was to conduct currency trades through a Citibank account. Finegan Test., Tr. at 339-42.

FN14. The Order Directing Conveyance of Funds agreed to by counsel for the SEC and counsel for Mr. Lee and signed by the Court today does not serve as full compliance with the Court's Order to repatriate. The Order only directs that banks convey the investor funds that remain in the accounts on which Mr. Lee was a signatory. The Order does not serve to repatriate the investor funds that have previously been transferred from these accounts.

FN15. Mr. Higley and Mr. Hayousio are joint venture partners of Colhida Trading in Chicago. Lee Test., Tr. at 191; Finegan Test., Tr. at 386.

D.D.C.,1995.
S.E.C. v. Bankers Alliance Corp.
Not Reported in F.Supp., 1995 WL 590665 (D.D.C.), Fed. Sec. L. Rep. P 98,717

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 2

Westlaw.

Release No. IA - 1497, 59 S.E.C. Docket 1115, 1995 WL 358127 (S.E.C.                Page 1
Release No.)

**H**

Release No. IA - 1497, 59 S.E.C. Docket 1115, 1995 WL 358127 (S.E.C. Release No.)

S.E.C. Commission (S.E.C.)

Investment Advisers Act of 1940

IN THE MATTER OF ALEXANDER v. STEIN

Admin. Pro.
File No. 3-8112

June 8, 1995

OPINION OF THE COMMISSION

INVESTMENT ADVISER PROCEEDINGS

Ground for Remedial Action

Criminal ConvictionWhere individual engaged in the investment advisory business was
convicted of securities, mail, and wire fraud, held, in the public interest to bar
him from association with any investment adviser.
APPEARANCES:
Alexander V. Stein, pro se.
Lawrence L. Kiser, for the Commission's Division of Enforcement.

Appeal filed: July 15, 1994

Briefing completed: October 26, 1994

I.

Alexander V. Stein, president and sole shareholder of both AVS Research, Inc. ("AVS
Research") and AVS Capital Fund ("AVS Capital" and, together with AVS Research,
"AVS"), appeals from the decision of an administrative law judge. The law judge
determined that, given Stein's recent conviction on numerous securities, mail, and
wire fraud charges, the public interest requires that Stein be barred from
association with any investment adviser. Our findings are based on an independent
review of the record, except for findings that Stein does not challenge on review.
As a result of that review, we agree that the conviction requires Stein's exclusion
from the investment advisory business.

II.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. IA - 1497, 59 S.E.C. Docket 1115, 1995 WL 358127 (S.E.C.                    Page 2
Release No.)

On May 20, 1993, a jury convicted Stein on thirty-five counts of securities fraud,
mail fraud, wire fraud, and money laundering in connection with a scheme which
defrauded fourteen victims of more than $6 million through two companies Stein
organized and controlled, AVS Capital and AVS Research.[FN1] On August 23, 1993,
Chief Judge James A. Redden, of the United States District Court for the District
of Oregon, sentenced Stein to six years in prison, followed by three years of
supervised release, and ordered him to make restitution in the amount of $5.26
million. Judge Redden added to this sentence an additional eleven months in prison
based on Stein's use, during the criminal trial, of a forged defense exhibit.

On appeal, the United States Court of Appeals for the Ninth Circuit affirmed
Stein's convictions for securities and wire fraud, affirmed Stein's convictions on
all but one of the mail fraud counts, and reversed Stein's convictions on three
counts of money laundering (reasoning that the district court's jury instructions
essentially relieved the government of its burden to prove an essential element of
these counts).[FN2] The Court of Appeals specifically found "appropriate" the
district court's determination to enhance Stein's sentence for obstruction of
justice, based on the court's factual finding that Stein wilfully submitted to that
court a forged document.[FN3] Because the Court of Appeals reversed four of the
thirty-five counts on which Stein's sentence was based, it vacated Stein's sentence
and remanded for resentencing.

III.

The factual background of Stein's multi-count conviction, which is derived from the
superseding indictment filed with the U.S. District Court, the testimony of the
attorney who prosecuted the case against Stein, and the Court of Appeals' decision
on review of that conviction, follows.[FN4] Between 1983 and 1988, Stein sold to the
public interests in what he falsely misrepresented to be a "fully-hedged arbitrage
program" involving securities listed on the New York Stock Exchange ("Exchange")
and options on those securities. Stein advised his clients that the investments
offered were totally risk free and would return up to 50% per year. As part of his
scheme to induce investors to part with their funds and then lull them into
maintaining accounts with AVS, Stein made material misrepresentations of fact which
he supported through the use of numerous forged documents.[FN5]

*2 Specifically, Stein sent to his clients false periodic account statements and
false and misleading letters purporting to reflect that their assets had been
invested in "fully-hedged arbitrage," [FN6] when in fact they had not been so
invested. Moreover, in order to convince certain investors of the legitimacy of
their AVS investments, Stein provided these investors with copies of forged
brokerage statements purporting to show AVS investment positions. These statements
inflated AVS Capital's account balance from $63,750 to over $9 million.

Stein further induced a false sense of security about AVS's investment success by
showing to a customer three forged checks made payable to AVS reflecting amounts of
$5.95 million, $1.486 million, and $1.818 million. These three checks were
forgeries Stein created from copies of two original checks, each in the amount of
$500. Stein also failed to disclose material facts to investors, including that he
had placed some client funds in highly speculative investments, and subsequently

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

diverted other client funds for his personal use.[FN7]

Additionally, Stein forged a series of contracts that gave the appearance that AVS was to be the beneficiary of certain highly lucrative stock purchase arrangements. Stein then lied to the Securities Commission for the State of Oregon and permitted that commission's lead securities examiner to mail a Consent to Cease and Desist Order and Agreement ("Consent Order"), executed by Stein, to Stein's clients. The Consent Order included the misrepresentation that millions of dollars soon would be paid to AVS in connection with the putative stock purchase arrangements and that these funds would be used to satisfy Stein's obligations to investors. Sending the Order lulled investors and thereby delayed the discovery of and action upon Stein's earlier fraudulent solicitations of investor funds.[FN8]

IV.

Under Section 203(f) of the Investment Advisers Act of 1940 ("Advisers Act"), we may sanction any person who is, or at the time of the alleged misconduct was, associated with, an "investment adviser," if we find that the sanctions we impose are in the public interest and that, among other things, the person has wilfully violated provisions of the federal securities laws or been convicted, within ten years of the commencement of our proceeding, of certain enumerated crimes including securities, mail, or wire fraud.

Stein concedes the fact of his conviction for securities, mail, and wire fraud. He disputes, however, our authority to institute this proceeding on the basis that he was neither himself a registered investment adviser nor associated with a registered investment adviser during the time of his misconduct.[FN9] Our authority to proceed under Section 203(f), however, does not rest on whether or not an entity or individual has registered with this Commission.[FN10] It does rest on whether or not an entity or individual in fact acted as an investment adviser. While Stein claims that there is insufficient evidence on this record from which to conclude that he acted as an investment adviser, we cannot agree.[FN11] The record reflects that Stein held himself out as an investment adviser to members of the public when he recommended, in the course of his business activities undertaken through the AVS companies he controlled, that clients invest their funds in his "fully hedged arbitrage program." [FN12] Stein received the requisite compensation for his services when he subsequently diverted certain of these funds for his personal use.[FN13] We conclude, in sum, that Stein's conviction and the nature of Stein's activities provide the requisite predicates for this proceeding.

V.

*3 Stein contends that he was not given adequate notice of the hearing before the law judge, that he unfairly was denied a postponement, and that, as a consequence, he was unable to present a defense in these proceedings. We find Stein's contentions meritless.[FN14]

Prompt service of the Order Instituting Proceedings ("Order") in this matter was thwarted due to Stein's incarceration and his relocation from a local detention facility to a federal facility.[FN15] Stein, however, received the Order, dated August 5, 1993, sometime before August 31, 1993, the date on which he prepared and mailed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. IA - 1497, 59 S.E.C. Docket 1115, 1995 WL 358127 (S.E.C.                          Page 4
Release No.)

a motion for additional time to file his answer to the order. By mid-September
1993, Stein also received the law judge's order granting the Division of
Enforcement's motion for postponement of the September 14, 1993 initial hearing
date. This order specifically set the new hearing date for October 12, 1993. The
hearing was postponed once again for an additional week, and occurred on October
19, 1993.

Stein thus had well over a month to prepare any defense to the allegations in the
Order, and to request, pursuant to Rule 14(b) of our Rules of Practice, that
witnesses be subpoenaed on his behalf and that the law judge afford him assistance
in obtaining any documents he required for his defense.[FN16] Stein chose instead to
wait until October 14, 1993 (once he learned that the October 12, 1993 date had
been postponed for an additional week), to request a 30- or 90-day postponement of
the hearing, on the ground that he had not had adequate time to prepare a
defense.[FN17] As the law judge found, Stein failed to claim in any of his pretrial
motions or in a supplemental statement filed with his answer that he could not
defend himself without certain materials or witnesses. Moreover, as the law judge
also found, Stein failed to specify in his motion to postpone those materials he
claimed to need. Under all the circumstances, we conclude that the law judge's
decisions to deny Stein's motion for postponement (when Stein made this request in
person on commencement of the hearing), to proceed with the hearing (for which she
had travelled from Washington, D.C. to Sheridan, Oregon), and to keep the hearing
record open for Stein to add supplemental material as he saw fit were not the
"unreasoning and arbitrary insistence upon expeditiousness" that invalidates a
refusal to postpone a hearing.[FN18]

In any event, Stein's conviction provides a basis for this proceeding. Stein
asserts that the evidence that he now asserts that he would have introduced would
rebut the criminal prosecutor's testimony regarding his misuse of investor funds,
the willfulness of his misconduct, the conditions under which investors gave him
money, whether his scheme involved forgeries, and whether he in fact had the intent
and ability to repay investors. The specific allegations in the indictment that led
to Stein's conviction demonstrate that Stein wilfully engaged in a scheme to
defraud investor-clients. He solicited clients to invest in his "program," and
failed to disclose that investor funds would be diverted for his personal
investments, assets, and expenses. Stein kindled reliance on his scheme through
numerous forgeries and false representations as to his ability and intent to repay
those he had defrauded. Stein may not negate these conclusions; indeed, Stein's
conviction has been established, and Stein may not challenge its validity.[FN19]

VI.

*4 We believe that a bar from the investment advisory business is appropriate to
protect the public interest.[FN20] Stein was convicted of serious violations of the
securities laws and of other blatantly criminal activity that spanned a five-year
period. His dishonesty was apparent to the district court that heard the evidence
and to the court of appeals that reviewed the record of his criminal trial.
Moreover, Stein has failed to acknowledge guilt, which indicates to us that
rehabilitation cannot be expected.[FN21] Stein must not be permitted to be in a
position to misuse investor funds again, and others who might be encouraged by a
more lenient sanction from acting in this fashion must be deterred.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. IA - 1497, 59 S.E.C. Docket 1115, 1995 WL 358127 (S.E.C.    Page 5
Release No.)

Given Stein's multi-count conviction, our sanction here would be no different if
Stein in fact conclusively had established to us, as he asserts in his brief that
his "evidence" would have demonstrated, that he, among other things, used little of
the investors' funds for personal luxury items, accepted very little retirement
income for investment, made some attempt to repay those he defrauded but had little
ability to do so, and may now have control of certain assets that he intends to
make available to defrauded investors. Cf. Blinder, Robinson & Co., Inc. v. SEC,
837 F.2d 1099, 1109 (D.C.Cir.1988) (in deciding "nature and scope of sanctions that
are appropriate in the public interest ... "evidence relating to a party's degree
of culpability must be considered").

Under all the circumstances, the public interest will be served by Stein's bar from
the investment advisory business.

An appropriate order will issue.[FN22]

By the Commission (Chairman LEVITT and Commissioners ROBERTS and WALLMAN).

Jonathan G. Katz
Secretary

FN1 United States v. Alexander V. Stein, CR 92-150 (D.Or.) (convicting Stein for
violations of Section 17(a) of the Securities Act of 1933, 15 U.S.C. 77q(a), and
for violations of 18 U.S.C. sections 1341, 1343, and 1956).

FN2 United States v. Stein, 37 F.3d 1407 (9th Cir.1994), cert. denied, 115 S.Ct.
1170 (1995).

FN3 37 F.3d 1411.

FN4 Throughout the course of the criminal proceedings, and in connection with this
administrative proceeding, Stein has asserted his Fifth Amendment privilege against
self-incrimination.

FN5 The testimony of the criminal prosecutor before the law judge highlighted that
Stein's activities involved "numerous instances of false, fraudulent, and forged
documents." The court of appeals similarly observed that "[t]he record is replete
with examples of Stein using forged documents as a means of evading detection." 37
F.3d at 1411.

FN6 Stein represented that investor funds would be invested in securities and
futures contracts, to hedge both AVS-owned Exchange-listed securities and loans
made by AVS to other entities that owned Exchange-listed securities. Stein further
represented that AVS investors would receive periodic account statements accurately
reflecting the value of each investor's account.

FN7 Specifically, the indictment alleged that Stein diverted investor funds to pay
personal expenses and purchase personal investments. The criminal prosecutor
testified that certain funds used by Stein for personal items such as automobiles,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. IA - 1497, 59 S.E.C. Docket 1115, 1995 WL 358127 (S.E.C. Release No.)

jewelry, and a fur coat had been traced to investors.

FN8 The court of appeals' decision describes this aspect of Stein's scheme in some detail. See 37 F.3d at 1408-09.

FN9 AVS Research, one of the firms through which Stein conducted his fraudulent scheme, was registered as an investment adviser between 1972 and 1982. Stein withdrew AVS's investment adviser registration on August 24, 1982. The law judge took official notice of the adviser registration application filed on behalf of AVS Research in 1979. While a Commission database entry reflects that we received this application, we have determined that a copy of the application is no longer maintained in the Commission's official files.

FN10 See Section 203(f) (conferring authority on this Commission to proceed against "any person associated, seeking to become associated, or, at the time of the alleged misconduct, associated or seeking to become associated with an investment adviser," without reference to whether the person or investment adviser is registered with us). This broad statutory language may be contrasted with the more limited language found in other Advisers Act provisions. See, e.g., Sections 204 (governing "[e]very investment adviser ... other than one specifically exempted from registration pursuant to section 203(b)" and 205 (addressing every investment adviser, "unless exempt from registration pursuant to Section 203(b)"). See also Pub.L. No. 86-750, § 8, 74 Stat. 885, 887 (1960); S.Rep. No. 1760, 86th Cong., 2nd Sess. 7-8 (1960) (explicitly amending Section 206 to provide that it cover all investment advisers, not simply those registered with this Commission). Cf. John Kilpatrick, 48 S.E.C. 481, 486-87 (1986) (noting that Section 15(b)(6) of the Securities Exchange Act of 1934, which authorizes us, if we make certain findings, to sanction "any person associated, or seeking to become associated, with a broker or dealer," "does not limit us to proceeding against persons associated with registered broker-dealers").

Certainly this is not the first instance in which we have proceeded, under authority of Section 203(f), against an individual neither registered as an investment adviser nor associated with a registered investment adviser. See, e.g., Joseph D'Angelo, 46 S.E.C. 736 (1976) (in action brought under Section 203(f), we barred individual not registered as an investment adviser who had failed to disclose in an application for such registration, that he had been permanently enjoined from violating registration and antifraud provisions).

FN11 Our analysis here is governed by Section 202(a)(11) of the Advisers Act (defining "investment adviser" as a person, who for compensation, engages in the business of advising others, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities) and Section 202(a)(17) of the Advisers Act (defining "person associated with an investment adviser" as including any officer or director of that investment adviser or any person directly or indirectly controlling or controlled by that investment adviser). Like Section 203(f), these definitional sections, by their terms, are not limited to persons registered with the Commission. See also Advisers Act Rel. No. 1092 (October 8, 1987), 39 SEC Docket 653 (clarifying elements of the definition of "investment adviser").

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. IA - 1497, 59 S.E.C. Docket 1115, 1995 WL 358127 (S.E.C. Release No.)                                Page 7

FN12 The criminal prosecutor recounted that various AVS investors testified at the criminal trial that Stein "gave them a sales pitch on how much money [he] could make them, and what [he] wanted to do with their money, if they invested with him."

FN13 See Advisers Act Rel. No. 1092, 39 SEC Docket at 661-62 ("compensation element [of definition of investment adviser] is satisfied by the receipt of any economic benefit"). It is unclear whether Stein charged his clients a fee or commission for his services. It is clear that he, in effect, paid himself from his clients' funds, when he diverted a portion of these funds to his personal use. That Stein may have declined to "charge" his clients for his services, knowing he would compensate himself with client funds, cannot place him outside the definition of "investment adviser." See SEC v. Capital Gain Research Bureau, Inc., et al., 375 U.S. 180, 195 (1963) (footnote omitted) ("Congress intended the Investment Advisers Act of 1940 to be construed like other securities legislation 'enacted for the purpose of avoiding frauds,' not technically and restrictively, but flexibly to effectuate its remedial purposes."). Compare SEC v. Lauer, 1995 U.S.App. LEXIS 8124, *5, reh'g denied, 1995 U.S.App. LEXIS 11609 (7th Cir.) ("It would be a considerable paradox if the worse the securities fraud, the less applicable the securities laws.").

FN14 We also reject as meritless Stein's additional contentions that the hearing in this matter was inadequate because it lasted only two hours, and that the law judge's rulings evidence her bias against Stein.

FN15 There is nothing in this record to indicate, as Stein contends, that the Division of Enforcement deliberately misrouted Stein's mail in order to deny him proper notice of this proceeding.

FN16 At other points in this proceeding, Stein has displayed a facility for utilizing our Rules of Practice and for representing himself both aggressively and ably. For instance, Stein relied on Rule 8(d) as a basis for his September 15, 1993 motion, filed with the law judge, requesting that the Division of Enforcement be ordered to furnish an outline of its case against Stein, its legal theories, the identity of its witnesses and a list of documents it intended to introduce. Indeed, Stein advised the law judge that he had purchased "on the outside" his own copy of our Rules.

FN17 The law judge had not received this request by the date of the hearing.

FN18 Morris v. Slappy, 461 U.S. 1 (1983); see also, e.g., Richard R. Perkins, Securities Exchange Act Rel. No. 32188 (April 21, 1993), 53 SEC Docket 3944, 3954.

Stein's post-hearing correspondence indicates that, during the time in which the hearing record remained open, Stein had in hand the transcripts of his criminal trial and sentencing hearings he now asserts he was precluded from introducing on his own behalf. Stein apparently chose not to furnish these to the law judge as late-filed exhibits. Pending before us is Stein's motion that we now adduce these transcripts. Although the Commission's Secretary recently directed Stein to provide a copy of the materials he seeks to adduce, Stein did not respond to this request or furnish the materials. We therefore deny Stein's motion. See Rule 21(d) of the Rules of Practice, 17 C.F.R. 201.21(d).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. IA - 1497, 59 S.E.C. Docket 1115, 1995 WL 358127 (S.E.C.
Release No.)

FN19 See, e.g., <u>Elliot v. S.E.C., 36 F.3d 86, 87 (11th Cir.1994)</u> (stating that a criminal conviction cannot be collaterally attacked in an administrative proceeding); <u>Wolfson v. Baker, 623 F.2d 1074 (5th Cir.1980)</u> (issues which were essential to the verdict must be regarded as having been determined when a criminal conviction is based on a jury verdict).

In other pleadings Stein has contended, contradictorily, that all of the witnesses he would have subpoenaed and the thrust of all pieces of evidence he would have introduced would have addressed directly the issue of whether he was acting as an investment adviser or as principal in an investment advisory business. Our conclusion on this issue as set forth in IV, supra, similarly is based on the description of Stein's conduct set forth in the indictment, on the criminal prosecutor's testimony as to what was proven at trial, and on the findings of the court of appeals on review of the conviction.

We address infra the relevance to our public interest determination of Stein's "evidence."

FN20 Cf. In the Matter of Richard C. Spangler, 46 S.E.C. 238, 252-53 (1976) (explaining that, when past misconduct involves fraud, fidelity to the public interest requires that we be mindful of the fact that the securities business is one in which opportunities for dishonesty recur constantly).

FN21 The criminal prosecutor testified that Stein was exceptionally persuasive in defrauding victims through "charm, wit, lies, elaborate forgeries and broken promise[s]" and given the opportunity Stein would probably return to the investment advisory business because it had been extremely profitable for him.

FN22 All of the contentions advanced by the parties have been considered. They are rejected or sustained to the extent that they are inconsistent or in accord with the views expressed in this opinion.

Release No. IA - 1497, 59 S.E.C. Docket 1115, 1995 WL 358127 (S.E.C. Release No.)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 3

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.), Fed. Sec. L. Rep. P 91,291
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.))**

◄S.E.C. v. Chemical Trust
S.D.Fla.,2000.

United States District Court, S.D. Florida.
SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,
v.
CHEMICAL TRUST, U.S. Guarantee Corp., United
Marketing Trust, Virgil W. Womack, Clifton
Wilkinson, Lewey L. Cato, III, and Alvin A. Tang,
Defendants,
THREE RIVERS TRUST, Prestige Accounting
Services, Inc., ACC Capital Consultants, Inc., the
Falcon Trust Company, Ltd., America's Fidelity
Assurance Company, Ltd., Merrit Pierce Trust, and
U.C.B.M. (Bahamas), Ltd. Relief Defendants.
**No. 00-8015-CIV.**

Dec. 19, 2000.

*FINAL JUDGMENT IMPOSING EQUITABLE
RELIEF AGAINST RELIEF DEFENDANT ACC
CAPITAL CONSULTANTS, INC.*

RYSKAMP, J.
This matter came upon the motion by the Securities
and Exchange Commission ("Commission") for
summary judgment against Relief Defendant ACC
Capital Consultants, Inc. ("ACC").

Procedural History

On January 7, 2000, the Commission filed its
Complaint. The Court entered an *ex parte* temporary
restraining order to stop Chemical Trust's alleged
fraudulent securities offering and ordered an asset
freeze against the defendants and relief defendants,
among other relief, on that date. The Court held a
preliminary injunction hearing on January 13, 2000.
Following the hearing, the Court entered preliminary
injunctions against all defendants and relief
defendants and ordered a continuation of the asset
freeze. On various dates, the Court permanently
enjoined all the defendants, either by their consent or
following dispositive motions by the Commission,
and ordered them to make disgorgement and to pay
civil money penalties, among other relief.

Pertaining to the relief defendants, the Court entered
a default judgment against relief defendant Prestige
Accounting Services, Inc., and ordered it to make
disgorgement. The Court ordered relief defendants
Merrit Pierce Trust and Three Rivers Trust to make
disgorgement following dispositive motions by the
Commission.

On January 27, 2000, the Court entered a consent
order against relief defendant ACC requiring it to
make disgorgement in the amount of $914,626.49.
However, the Commission now seeks summary
judgment against ACC based upon additional
evidence that it received more funds than it
voluntarily consented to disgorge.

The Court being fully advised in the premises, the
Court makes the following findings of facts,
conclusions, and orders:

FINDINGS OF FACTS

The Court finds that the Commission has made a
proper and sufficient showing in support of its
motion for summary judgment that the following
material facts are not disputed:

THE UNDERLYING SECURITIES FRAUD

The Defendants

*Chemical Trust* was a "business trust" with principal
offices purportedly located in West Palm Beach,
Florida; Birmingham, Alabama; and Seneca, South
Carolina. These locations were in fact mail drop-
boxes. In July 1999, Chemical merged with Alliance
Trust ("Alliance"), the trust organization under
whose name the investment was previously being
offered and sold. Throughout 1999, a number of
states securities agencies issued cease-and-desist
orders against Chemical Trust and Alliance Trust for
the sale of unregistered securities. Chemical has
never been registered with the Commission in any
capacity.

*U.S. Guarantee Corp.* is a Nevada corporation with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.), Fed. Sec. L. Rep. P 91,291
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.))**

principal offices located in Scottsdale, Arizona. U.S. Guarantee purported to provide a surety payment bond to investors for 100% of their principal amount invested.

*United Marketing Trust* was a trust organization with principal offices purportedly located in Atlanta, Georgia. United was Chemical's marketing arm and handled all public relations and marketing aspects for Chemical.

*Virgil W. Womack* resided in Marietta, Georgia. Womack was the Chief Trustee of Alliance and was a Trustee of Chemical.

*Clifton Wilkinson* resided in Toccoa, Georgia. Wilkinson was the Trustee of Alliance and was a Trustee of Chemical.

Relief Defendants

*Three Rivers Trust* ("Three Rivers") was a Trust organization with principal offices purportedly located in Seneca, South Carolina. Three Rivers received at least $800,000 in investor funds from Chemical and Alliance. Womack was signatory on Three Rivers' bank account.

*Prestige Accounting Services, Inc.* ("Prestige") is a Georgia corporation with principal offices in Toccoa, Georgia. Prestige received at least $2.3 million in investor funds from Chemical. Wilkinson was the chief executive officer of Prestige and Womack was the company's chief financial officer.

*Merrit Pierce Trust* ("Merrit") was a Trust organization with principal offices purportedly in Seneca, South Carolina. Merrit received at least $10,000 in investor funds from Alliance Trust and $50,000 from Chemical. Womack is the Chief Trustee of Merrit.

*ACC Capital Consultants, Inc.* was organized as a Florida corporation on June 23, 1999 and maintained its principal office in Stuart, Florida. ACC's president at all times material hereto was James A. Laiacona. The State of Florida dissolved ACC on September 22, 2000 for failure to file its annual report.

The Fraudulent Scheme

*Chemical's Offering*

Between approximately April 1999 and January 2000, Chemical offered and sold "guaranteed contracts" to the general public. The offering began under the name "Alliance". In July 1999, Alliance purportedly merged with, and became known as, Chemical. Chemical raised at least $17 million from at least 350 investors and promised them returns ranging between 9.25% and 15% per annum depending upon the amount invested. The Chemical investment had a term of 12 months, or longer, if the investor chose, and interest was paid monthly during the term of the investment. However, investors were told that they could earn an extra bonus at year end if their interest was left to accrue. Investors were also given the option of investing their funds in Individual Retirement Accounts ("IRA") through an IRA custodian selected by Chemical.

Chemical's "guaranteed contracts" were offered and sold to the general public through a network of independent sales agents. The agents were recruited primarily by United through advertisements on the Internet. In order to sell the investment, an agent was required to pay a fee of $99.00. Once the fee was paid, United provided the agent with marketing materials and a training manual. United also responded to investor and agent questions. Based on the amount invested, Chemical allocated a lump-sum amount comprised of the sales agent's commission and the interest due to the investor. The agent determined the amount he kept for himself as commission. The reminder was set aside for the investor as his return on the investment. The agent's commission and the rate of return paid to the investor varied because the agent could arbitrarily decide the investor's rate of return.

Chemical's sales agents solicited investors nationwide through newspaper advertisements and sales seminars. Chemical did not require its sales agents to hold securities licenses. No registration statement was filed or had been in effect with the Commission in connection with the securities offered by Chemical.

*Chemical's Offering Materials*

Prospective investors received a package of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.), Fed. Sec. L. Rep. P 91,291
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.))

Chemical's offering materials describing the investment. The offering materials previously distributed to prospective investors by Alliance and the materials later distributed by Chemical were virtually identical. The offering materials included an introductory letter to the prospective investor, a one-page "explanation of the trust", a document entitled "questions and answers for the client," as well as background and financial information on U.S. Guarantee. Some prospective investors were also provided with a tri-fold brochure, which boasted the financial strength of Chemical and U.S. Guarantee and discussed the terms and safety of the investment.

Chemical's offering materials represented to investors that their funds would be used to buy treasury notes and distressed properties. In the materials, investors were told that "100% of [their] money goes to work for [them]." The materials further represented to investors that their funds were secured by a "surety payment bond" issued by U.S. Guarantee. Investors were told that the principal is always guaranteed to the amount of the investment. In an introductory letter signed on different occasions by either Defendants Wilkinson or Lewey L. Cato, III (a Trustee of Chemical), investors were told that Chemical had been in business for 14 years and that it had assets ranging from $450 million to $750 million. In the letter, potential customers were told that Chemical's investment program "provides security that the market does not because of the guarantee principle" and provided "substantially higher interest rates than obtained through CD's and Fixed Annuities."Chemical concluded the letter by telling investors that it is "proud to offer one of the finest investment programs available today."

The offering materials also included information regarding U.S. Guarantee. Specifically, investors were provided with background information on U.S. Guarantee, biographies of its principals, letters of reference from companies that purportedly did business with U.S. Guarantee, and a copy of U.S. Guarantee's balance sheet. Investors were provided with one of two versions of U.S. Guarantee's balance sheet. The earlier version dated February 15, 1999 showed the company as having total assets of $6 billion and the later version dated July 13, 1999, showed total assets at $2.4 billion.

The purported safety and security of the investment

was verbally reinforced to investors by Chemical's sales agents. As in the offering materials, Chemical's sales agents verbally told investors that their investment was 100% secured because of the surety bond issued by U.S. Guarantee.

*Role of Womack*

Womack laid the groundwork for the success of the fraudulent offering. Womack set up Alliance and Chemical, and each trust agreement was signed solely by him. Womack was one of the Trustees of Chemical and the Chief Trustee of Merrit Pierce Trust. Womack was also chief financial officer of Prestige Accounting Services, Inc. ("Prestige"). In addition, Womack was signatory on Three Rivers Trust's and Merrit Pierce Trust's bank accounts. Womack was also responsible for opening the various mail drop-boxes for Chemical, which purported to be its offices in Florida, Alabama and South Carolina. Womack was the only person with signature authority over Chemical's bank accounts and controlled the movement of funds in those accounts.

*Role of Wilkinson*

Defendant Wilkinson, as one of the Trustees of Chemical, managed the affairs of the trust and acted as a contact person for sales agents and investors. The materials distributed to investors included the introductory letter from Wilkinson, as Trustee of Chemical, which touted the company's 14 years of experience and described the investment as "an opportunity that is too good to be missed."In addition, Wilkinson responded directly to the state securities regulators investigating Chemical. In letters to state regulators, Wilkinson claimed that the contracts offered by Chemical "are exempt from regulation ... as a pure contract trust" and that "any statutes or regulations that purport to regulate a pure contractual trust [is] in violation of the Article One, Section Ten of the Constitution of the United States."

Wilkinson communicated verbally with sales agents and answered any questions they might have concerning the investment. He also communicated with them in writing. For example, the training manual provided to agents included written instructions from Wilkinson. In addition, Wilkinson sent a letter to Chemical's sales agents claiming that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the communications received by some of the agents from various state securities agencies were "negative and misplaced." In this letter, Wilkinson emphasized that the contracts issued by Chemical were exempt from state securities laws under article one, section ten of the Constitution. Wilkinson was the signatory on the Prestige bank account.

*Misrepresentations and Omissions*

*Misappropriation of Investor Funds*

Chemical's representations that funds would be used purchase U.S. treasury notes and distressed properties were blatantly false. Investor funds were not used to purchase treasury notes and properties as represented. Instead, bank records revealed that investor funds were misappropriated and diverted offshore. More than $9.0 million of investor funds were wire transferred to offshore bank accounts located in the United Kingdom and the Bahamas. Records also show that approximately $3.29 million in investor funds were diverted to U.S. Guarantee. In addition, bank records revealed that Chemical was engaged in a Ponzi scheme and used new investor monies to pay interest to its existing investors.

*The Assets of U.S. Guarantee*

The offering materials distributed to investors included an unaudited copy of U.S. Guarantee's balance sheet. Investors were provided with one of two versions of the balance sheet. The earlier version dated February 15, 1999 showed the company as having total assets of $6 billion and the later version dated July 13, 1999 showed total assets at $2.4 billion. The difference in the two versions was attributable to certain gold backed bonds. The February 15, 1999 balance sheet included as assets 24 historical railroad gold bearer bonds with a purported total value of more than $4 billion. However, those bonds were not actually payable in gold, were not backed or guaranteed by the U.S. government, and had no value except as collectibles. The worth of any one of these bonds as collectibles was not more than $250.00.

Both versions of U.S. Guarantee's balance sheet also falsely included as assets real estate purportedly worth more than $100 million. Specifically, the properties consisted of three 5,000 acre parcels

located in Bledsoe County, Tennessee purportedly worth $37.5 million and a 31,310 acre parcel located in Warren, Grundy and Sequatchie Counties, Tennessee purportedly valued at $62.6 million. In fact, the three 5,000 acre properties did not exist. As to the 31,310 acre parcel, no property records evidence U.S. Guarantee as ever having owned this property.

U.S. Guarantee's balance sheet also falsely included as assets certificates of deposit ("CDs") purportedly worth a total of $167 million. Two of the CDs on the balance sheet, reportedly worth $25 million each, were issued by a bank in Indonesia. Two of the CDs on the balance sheet, reportedly worth $25 million each, were issued by a bank in Indonesia. *Id.* However, the CD's had expired and had not been rolled over or extended; U.S. Guarantee paid at most $200,000 for them, and U.S. Guarantee's chief financial officer, Stephen M. Hammer ("Hammer"), considered the CD's worthless.

The other CDs listed on U.S. Guarantee's balance sheet consisted of five CDs purportedly worth a total of $117 million issued out of the Bank of China. With regard to these CDs, Hammer testified that although U.S. Guarantee had a contract for transfer of the CDs, it was never effectuated. He testified that, based on this, it was erroneous for U.S. Guarantee to claim that it possessed these CDs. Therefore, even assuming these CDs were real and worth $117 million, it was false and misleading to include them on U.S. Guarantee's balance sheet.

*U.S. Guarantee's Authority to Issue Surety Bonds*

The Chemical offering materials informed investors that U.S. Guarantee would issue a "surety payment bond" for 100% of their principal amount invested. In fact, U.S. Guarantee has not been licensed in Arizona where it is headquartered to issue surety bonds. Arizona law requires companies that underwrite surety bonds in the state to be licensed. Likewise, U.S. Guarantee has not been licensed to issue surety bonds in at least two states where it issued surety bonds to Chemical investors.

*Background of Principals*

The Chemical offering materials contained false and misleading biographies of U.S. Guarantee's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.), Fed. Sec. L. Rep. P 91,291
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.))**

Page 5

principals. For example, investors were told that defendant Alvin A. Tang ("Tang"). U.S. Guarantee's chief operating officer, received his M.B.A. from Century University in California. In fact, Tang never received an M.B.A. or any other degree from Century University. In addition, the materials failed to disclose that Tang filed personal bankruptcy in July 1998 and was discharged in November 1998.

Chemical's offering materials informed investors that Hammer, chief financial officer of U.S. Guarantee, received his degree from the University of Oregon. In fact, Hammer never received a degree or even attended the University of Oregon. The materials also profile Kenneth Turner ("Turner"), the company's comptroller, and represented that he received his degree from the University of Michigan. Although Turner attended the university, he never graduated. Further, the materials profiled Russell G. Miller ("Miller"), senior vice-president, and claimed that he graduated from University of Texas. Miller attended the university, but he never received a degree.

Finally, the offering materials profiled former U.S. Congressman Barry M. Goldwater, Jr. ("Goldwater") as a vice-president and director of U.S. Guarantee and claimed that he was "responsible for the management of assets and investments for [U.S. Guarantee] as well reviewing [sic] investment decisions before they are implemented."Goldwater denied such claims.

*Chemical's Operating History*

Chemical misrepresented its operating history to investors. In its offering materials, Chemical claimed that it has "been providing clients steady streams of interest and the return of their principal [sic] since its inception."Chemical represented that it has been in business for fourteen years and has assets worth $750 million. This representation was blatantly false. Chemical's and Alliance's own trust formation documents reflected that they were both only formed in March 1999. Chemical also represented to investors that it had satellite offices throughout the country. In fact, it did not. Chemical's purported offices in Florida, Alabama and South Carolina were merely mail drop-boxes.

*State Cease-and-Desist Orders*

Letters included in Chemical's offering materials stated that the "guaranteed contracts" are not securities and therefore do not have to be registered. This statement was false because numerous state securities agencies issued cease-and-desist orders in connection with the Alliance and Chemical offerings against, among others, Chemical, Alliance and Wilkinson for violations of the registration provisions of their respective state securities laws. From July 1999 through December 1999, nine states issued cease-and-desist orders against Chemical, Alliance and their principals for selling unregistered securities. U.S. Guarantee was also the subject of two of the cease-and-desist orders. Despite entry of the cease-and-desist orders, Chemical continued to make offers and sales of its "guaranteed contracts" to investors while claiming that they are not securities. At a minimum, Chemical should have disclosed that cease-and-desist orders had been entered against it and against Alliance that contradicted the representations that the investment was not subject to the registration requirements.

### DIVERSION OF FUNDS TO VARIOUS BUSINESS ENTITIES

Role of ACC

Between at least June 17, 1999, and November 30, 1999, ACC received at least $1.75 million in investor funds from bank accounts controlled by Womack and Wilkinson. Accounts were in the names of Defendant Chemical Trust, its predecessor Alliance Trust, Continental Trust, and Relief Defendants Three Rivers Trust, Prestige Accounting Services, Inc., and Merrit Pierce Trust transferred at least $1.55 million in investor funds to a bank account in ACC's name at Bank of America. Likewise, funds from bank accounts in the names of AT, Inc. (an alias of Alliance Trust) and Alliance Trust transferred at least $200,000 in investor funds to a bank account in ACC's name at A.G. Edwards & Sons, Inc. ACC has not demonstrated any bona fide reason for its possession of any of the investment funds.

By January 7, 2000, the date of the temporary asset freeze ordered in this matter, ACC had transferred $608,333.23 back to Chemical Trust and Three Rivers Trust. On January 26, 2000, the Federal Bureau of Investigation in a parallel criminal matter, seized $26,940.28 from ACC. With ACC's consent,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.), Fed. Sec. L. Rep. P 91,291
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.))

Page 6

the Court entered an order on January 27, 2000 requiring ACC to surrender $914,626.49 to the Court's Registry. On March 10, 2000, ACC deposited $414,626.49 into the Court Registry in this matter.

*CONCLUSIONS OF LAW*

ACC offers no evidence or argument why summary judgment against it is inappropriate. Since there are no genuine issues of material fact to be tried, summary judgment against ACC is appropriate.

I. *Summary Judgment Standard*

Under Federal Rule of Civil Procedure 56, summary judgment:

(c) ... shall be rendered forthwith if the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

To prevent summary judgment the non-moving party must come forward with evidence sufficient to support a finding by the trier of fact in its favor. *Wohl v. City of Hollywood,* 915 F.Supp. 339, 341 (S.D.Fla.1995) (Highsmith, J.). Under the Supreme Court's rulings in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986), "the trial judge must [enter summary judgment] if, under the governing law, there can be but one reasonable conclusion ..."*See also*Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)* ("[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'") (citation omitted).

Accordingly, summary judgment is appropriate because there is no genuine issue of material fact to be tried.

II. *The Ill-Gotten Nature of ACC's Funds:*

A. *The Defendants Sold Securities*

The defendants sold securities because the "guaranteed contracts" offered and sold in the Chemical offering had characteristics of both investment contracts and promissory notes and therefore were securities, as defined by Section 2(1) of the Securities Act of 1933 ("Securities Act") and Section 3(a)(10) of the Securities Exchange Act of 1934 ("Exchange Act"). In *SEC v. W.J. Howey Co.,* 328 U.S. 293 (1946), the Supreme Court defined an investment contract as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of others."328 U.S. at 298-99. The Chemical "guaranteed contracts" met the *Howey* investment contract analysis. The investors who purchased the investment contracts offered by Chemical made an "investment of money" when they committed their funds to Chemical, and risked losing their funds if the venture was not successful. The returns of each investor were interwoven with and dependent upon the success of Chemical's promoters or of third parties. The investors' funds were also combined in a pool with funds risked by other investors purportedly to purchase treasury notes and distressed properties. Chemical's investors had a strict or narrow "vertical" common interest with the promoters or third parties because of the sharing of profits and a "horizontal" common interest with other investors because of the purported pooling of funds to purchase treasury notes and distressed properties. Finally, Chemical's investors had no role whatsoever in the management of the trust, because Chemical, United, Womack, Wilkinson, and Cato were solely responsible for setting up and operating the purported investment trusts and marketing the program to investors. In this case, the investment was passive and investors needed only wait for their promised returns. *See,e.g.,SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 n. 7 (9th Cir.1973), *cert.denied*414 U.S. 821 (1973); *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473 (5th Cir.1974).

Additionally, the "guaranteed contracts" had the characteristics of promissory notes and therefore were securities as defined by Section 2(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. Promissory notes and contracts similar to the "guaranteed contracts" have been found to constitute securities under the relevant case law. In *Reves v. Ernst & Young,* 494 U.S. 56,*reh'g denied,*494 U.S. 1092 (1990), the Supreme Court adopted the "family resemblance" test articulated by the Second Circuit, in determining whether or not a particular note constitutes a security. The "family resemblance" approach presumes initially that every note is a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.), Fed. Sec. L. Rep. P 91,291
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.))

security. An issuer can rebut this presumption by showing that a particular note "bear[s] a strong family resemblance" to a list of notes that the Second Circuit has determined are not securities. *See,e.g.,Exchange Nat'l Bank v. Touche Ross & Co., 544 F.2d 1126, 1137 (2d Cir.1976); Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930, 939 (2d Cir.1984), cert. denied,469 U.S. 884 (1984).*

In concluding that the note at issue constituted a security, the *Reves* Court set forth the following four considerations: [FN1] 1) the motivation of the buyer and seller; [FN2] 2) the plan of distribution in order to determine whether the note is intended for speculation or investment; 3) the reasonable expectations of the investing public; and 4) whether there is any risk-reducing factor, such as the presence of another regulatory scheme.*Reves, 494 U.S. at 66-70.*

> FN1. None of the four criteria is crucial, and the failure of one will not automatically result in the determination that the note in question is not a security. *In re: NBW Commercial Paper Litigation, 813 F.Supp. 7, 12 n. 7 (D.D.C.1992).*

> FN2."If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'" ' *Reves, 494 U.S. at 66.*

Applying the four considerations under the *Reves* analysis, the "guaranteed contracts" were securities. First, the investor's motivation for investing in the Chemical offering was to obtain the promised return. The essential appeal of the investment was a rate of return substantially higher than what most market investments would have yielded. Likewise, the seller, Chemical, ostensibly sought to profit from the sale of the "guaranteed contracts" by earning profits from buying and selling treasury notes and distressed properties. Second, Chemical offered the "guaranteed contracts" through a nationwide network of sales agents who advertised and conducted sales seminars throughout the country soliciting a broad segment of the investing public. Third, the "guaranteed contracts" clearly involved an investment of money

with a corresponding expectation of profit, and there were "no countervailing factors that would have led a reasonable person to question this characterization."*Reves 494 U.S. at 68-69.* Fourth, there was no other applicable regulatory scheme available to regulate the "guaranteed contracts" and thereby reduce significantly the risk of the instrument such that the application of the Securities Act would be unnecessary. Therefore, under the *Reves* analysis, the "guaranteed contracts" were securities.

### B. *The Defendants Sold Unregistered Securities*

The defendants violated Sections 5(a) and 5(c) of the Securities Act. In general, those provisions make it unlawful, absent an exemption from registration, for any person to make use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, to sell, or to offer to buy any security or to carry such security for purposes of sale or delivery after sale, when no registration statement has been filed or is in effect as to the security.

In this case, Chemical offered and sold securities guaranteed by U.S. Guarantee to the public through various sales agents organized by United. At least 350 investors residing in numerous states purchased Chemical's securities. No registration statement was filed or in effect with respect to any of the securities sold by Chemical. Accordingly, the defendants violated Sections 5(a) and 5(c) by offering and selling securities when no registration statement had been filed with the Commission with respect to such securities. *SeeSEC v. Continental Tobacco Co., 463 F.2d 137 (5th Cir.1972).*

### C. *The Defendants Defrauded Investors*

The defendants also violated the antifraud provisions of the federal securities laws-Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 thereunder of the Exchange Act. Section 17(a) of the Securities Act, which proscribes fraudulent conduct in the offer or sale of securities, and Section 10(b) of the Exchange Act and Rule 10b-5, which proscribe fraudulent conduct in connection with the purchase or sale of securities, prohibit essentially the same type of sales practices. *SeeUnited States v. Naftalin, 441 U.S. 768, 773 n. 4 (1979).* In general, the elements of proof of a violation of Section 17(a)(1) of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.), Fed. Sec. L. Rep. P 91,291
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.))**

Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 are that: (1) the defendant, directly or indirectly, used a device or scheme or trick to defraud someone, or made an untrue statement of a material fact, or failed to disclose a material fact which resulted in making the defendant's statements misleading, or engaged in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller; (2) the defendant's acts were or his failure to disclose was in connection with the purchase or sale of a security (Section 10(b)) or involved the offer or sale of any securities (Section 17(a)); (3) the defendant intended to defraud someone or acted in reckless disregard whether someone would be defrauded; and (4) the defendant used or caused to be used some aspect of interstate commerce, the mails, a telephone or a facility of a national securities exchange, in furtherance of the acts or his failure to disclose whether or not the defendant's false statement itself passed through interstate commerce, the mails, by telephone or a facility of a national securities exchange. *SEC v. Rana Research, Inc.,* 8 F.3d 1358 (9 th Cir.1993); *SEC v. Tome,* 638 F.Supp. 596, 620 n. 46 (S.D.N.Y.1986) (distinguishing cause of action elements for private litigants), *aff'd,*833 F.2d 1086 (2d Cir.), *cert. denied sub nom.Lombardfin S.p.A. v. SEC,* 486 U.S. 1014 (1988).

"Material information" is defined as information that is substantially likely to be important to a reasonable investor in deciding whether to purchase, sell, or hold securities. *Basic, Inc. v. Levinson,* 485 U.S. 224, 240 (1988); 17 C.F.R. § 240.12b-2 (definition of "material") (as last amended in 62 F.R. 26386, June 14, 1997); *SEC v. MacDonald,* 699 F.2d 47, 49-50 (1 st Cir.1983); *SEC v. Geon Industries, Inc.,* 531 F.2d 39, 47-8 (2d Cir.1976); *Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 166 (2d Cir.1980), citing *Lily v. State Teachers Retirement System,* 608 F.2d 55, 58 (2d Cir.), *cert. denied,*446 U.S. 939 (1980); *SEC v. Shapiro,* 494 F.2d 1301, 1307 (2d Cir.1974).

Through Womack, Wilkinson, Cato and Tang, Chemical and United distributed offering materials to the public, which contained materially false statements and omissions regarding, among other things, the use of investor proceeds, the assets of U.S. Guarantee, the backgrounds of its principals and Chemical's operating history. This information undoubtedly would have been material to investors because it relates directly to the safety and risk involved in the Chemical investment.

Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5, require a finding of scienter to establish a violation. *SeeAaron v. SEC,* 446 U.S. 680, 697 (1980). Scienter, in the securities fraud context, has been defined by the Supreme Court as "intent to deceive, manipulate, or defraud."*Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 (1976). To act intentionally means to act deliberately, rather than mistakenly or inadvertently. The Supreme Court has not decided whether recklessness alone satisfies the scienter requirement. *SeeAaron,* 446 U.S. at 686 n. 5;*Ernst & Ernst,* 425 U.S. at 193 n. 12;*Herman & McClean v. Huddleston,* 459 U.S. 375 (1983). However, lower courts have concluded that scienter may be established by a showing of reckless disregard or acting in a manner that involves an extreme departure from ordinary care-conduct that is worse than being simply or inexcusably negligent or careless. *SEC v. Carriba Air, Inc.,* 681 F.2d 1318 at 1324 (11 th Cir.1982); *Healey v. Catalyst Recovery of Pennsylvania, Inc.,* 616 F.2d 641, 649-51 (3d Cir.1980); *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1306 (2d Cir.1973). A person acts recklessly if he knows the risk of potential harm involved, or it is obvious that an ordinary person under the circumstances would have realized the danger of harming someone and taken care to avoid the harm likely to follow. *Messer v. E.F. Hutton & Co.,* 847 F.2d 673, 678 (11th Cir.1988).

A finding of scienter is not required to establish a violation of Sections 17(a)(2) or (3) of the Securities Act. *SeeAaron,* 416 U.S. at 696-97. The elements of a violation of Sections 17(a)(2) and (3) require proof that a defendant, directly or indirectly, (1) in the offer or sale of securities; (2) obtained money or property by making an untrue statement of a material fact, or obtained money or property by failing to disclose a material fact which resulted in making the defendant's statements misleading, or engaged in a transaction, practice, or course of business that operated, or would operate, as a fraud or deceit upon an offeree or seller; and (3) the defendant used or caused to be used some aspect of interstate commerce, the mails, a telephone or a facility of a national securities exchange, in furtherance of the acts or his failure to disclose whether or not the defendant's false statement itself passed through

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 9
Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.), Fed. Sec. L. Rep. P 91,291
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.))

interstate commerce, the mails, by telephone or a facility of a national securities exchange.

The defendants knowingly distributed offering materials to investors and potential investors that contained the false and misleading information described above. The defendants, therefore, acted with scienter sufficient to establish violations of the antifraud provisions. Accordingly, they violated Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### D. *ACC Possesses Illegally Obtained Proceeds*

Relief defendant ACC received proceeds from the defendants' illegal scheme. As between the investors and ACC, ACC has no bona fide claim of title to any of the securities offering's proceeds. Accordingly, the Commission can obtain equitable relief from ACC without charging it with any wrongdoing where it "possess[es] illegally obtained profits but ha[s] no legitimate claim to them."*SEC v. Cherif,* 933 F.2d 403, 414 n. 11. (7th Cir.1991), *cert. denied,*502 U.S. 1071 (1992). It is not necessary for the person holding the property to have done anything wrong in order for that person to be required to return the property to its rightful owner. As recognized by the court in *U.S. v. Cannistraro,* 694 F.Supp. 62, 72 n. 11 (D.N.J.1988), "[t]he courts impose the remedy of constructive trust where, *rightfully or wrongfully,* a party has obtained property which unjustly enriches him."(emphasis supplied), *modified,*871 F.2d 1210 (3rd Cir.1989). Therefore, ACC is deemed to be a constructive trustee of the proceeds it obtained from the defendants' fraudulent and unregistered scheme. ACC is deemed to hold those proceeds for the benefit of the investors from whom the proceeds were illegally obtained.

### III. *Equitable Relief Is Appropriate*

The Court concludes that ACC continues to hold funds that belong to defrauded Chemical Trust investors. Accordingly, equitable relief is appropriate.

### A. *Disgorgement*

This Court has the equitable power to order ACC to disgorge all its ill-gotten gains to prevent it from being unjustly enriched through its wrongdoing or the wrongdoing of others. *SeeSEC v. First City Financial Corp.,* 890 F.2d 1215, 1230-31 (D.C.Cir.1989) (disgorgement primarily serves to prevent unjust enrichment); *SEC v. Bilzerian,* 814 F.Supp. 116, 120 (D.D.C.1993) ("The primary purpose of disgorgement is not to punish the wrongdoer but rather to prevent the unjust enrichment of the wrongdoer by depriving him of ill-gotten gains."). The disgorgement amount need only be a reasonable approximation of profits connected to the wrongful conduct. *SEC v. First City Financial Corp.,* 890 F.2d 1215, 1231 (D.C.Cir.1989). Once the Commission has shown that the disgorgement amount is a reasonable approximation of ill-gotten gains, the burden of proof shifts to the defendant. *Id.* at 1232.Further, if there is any uncertainty as to the amount to be disgorged, the "risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty."*Id.*

Here, there can be no dispute that from their fraudulent, unregistered activities the defendants received at least $17 million and relief defendant ACC received at least $1.75 million in investors' funds. In determining the disgorgement amount, "it is proper to assume that all profits gained while defendants were in violation of the law constituted ill-gotten gains."*SEC v. Bilzerian,* 814 F.Supp. 116, 120 (D.D.C.1993).

However, on these facts, it would be inequitable to require ACC to disgorge funds it had transferred back to the defendants and not otherwise converted to its own use, or not otherwise placed in the hands of third parties beyond the reach of the investors. By transferring some portion of the funds back to the defendants, the investors were made no worse off by ACC than they were already, being the victims of a Ponzi scheme. Likewise, funds that the FBI seized from ACC, $26,940.28, pursuant to a seizure warrant issued in a parallel criminal investigation may inure at a later time to the benefit of the defrauded investors herein. To the extent those funds do inure to the benefit of investors, they should be credited against ACC's accounting. To the extent those funds may fall into ACC's hands or the possession of any other defendant or relief defendant herein against whom a disgorgement order has been issued, those funds shall be surrendered to this Court's Registry. Further, ACC has already surrendered $414,626.49 to

Not Reported in F.Supp.2d                                                                                  Page 10
Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.), Fed. Sec. L. Rep. P 91,291
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.))

this Court's Registry, and ACC's accounting shall be reduced by that amount.

## B. *Asset Freeze and Repatriation Orders*

The defendants' and relief defendants' assets have been ordered frozen since the outset of this litigation, upon the Commission's preliminary showing that they committed securities fraud and/or possessed stolen investor funds. Also, ACC has been ordered, by its consent, to disgorge its ill-gotten gains, and it has not fully complied with this order. Therefore, the pre-trial orders freezing assets and requiring the repatriation of assets are hereby extended. It would be highly inequitable and illogical if, after a finding against the defendants that they committed securities fraud, and after a finding against ACC that it possesses some of the fruits of the fraud, ACC were then allowed to dissipate stolen investor funds that had once been frozen. Instead, the present asset freeze and repatriation orders should be continued so that, after the defendants and relief defendants eventually reveal the whereabouts of the stolen investor funds, the Commission can meaningfully pursue proceedings in execution of this Court's order. Other courts have ordered similar relief. *See* *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir.1972); *United States v. Cannistraro*, 694 F.Supp. 62 (D.N.J.1988). To do otherwise, after a finding on the merits against ACC, could have the perverse effect of giving it the unfettered right to dissipate stolen investor funds.

## C. *Records Preservation*

The Commission has requested continuation of the records preservation order. A continued order prohibiting record destruction is appropriate to prevent dissipation of assets and documents to assure that whatever equitable relief might ultimately be appropriate is available. *See* *SEC v. R.J. Allen & Associates, Inc.*, 386 F.Supp. 866, 881 (S.D.Fla.1974).

There being no genuine issue of material fact to be tried, the Commission's motion is hereby GRANTED, final judgment against ACC is entered, and the Court hereby ORDERS as follows:

### ORDERS

## I. *Disgorgement Order*

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that ACC is liable to disgorge the gross amount of proceeds it received from the scheme alleged in the Commission's Complaint, $1,750,000.00, less $608,333.23 it transferred back, indirectly, to defendant Virgil W. Womack prior to the filing of the Commission's Complaint, less $26,940.28 seized by the Federal Bureau of Investigation, subject to the condition that those funds shall be deposited in this Court's Registry for the benefit of defrauded investors herein and not ACC or any other defendant or relief defendant herein against whom a disgorgement order has been entered (should the U.S. District Court for the District of South Carolina lose jurisdiction over those funds for any reason), and less $414,626.49 paid to the Court Registry, for a net amount owed of $700,100.00, plus prejudgment interest. Such disgorgement and prejudgment interest shall be deposited into the Registry of this Court within ten (10) days from the entry of this final judgment. Nothing in this disgorgement order shall be construed as a waiver or limitation of any kind of this Court's ability to enforce its contempt power with respect to any violation of its prior orders entered in this action.

## II. *Order Freezing Assets*

IT IS HEREBY FURTHER ORDERED, ADJUDGED AND DECREED that, until further order of this Court, ACC, its directors, officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, who receive notice of this order by personal service, mail, facsimile transmission or otherwise be and they hereby are, restrained from, directly or indirectly, transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating or otherwise disposing of, or withdrawing any assets or property owned by, controlled by, or in the possession of Chemical Trust, Alliance Trust, U.S. Guarantee Corp., United Marketing Trust, Virgil W. Womack, Clifton Wilkinson, Lewey L. Cato, Ill, Alvin A. Tang, Three Rivers Trust, Prestige Accounting Services, Inc., The Falcon Trust Co., Ltd., America's Fidelity Assurance Co., Merrit Pierce Trust, and U.C.B.M. (Bahamas) Ltd., including, but

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 11
Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.), Fed. Sec. L. Rep. P 91,291
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.))**

not limited to, cash, free credit balances, fully paid for securities, and/or property pledged or hypothecated as collateral for loans. Nothing in this order freezing assets shall be construed as a waiver or limitation of any kind of this Court's ability to enforce its contempt power with respect to any violation of its prior orders entered in this action.

### III. *Repatriation Order*

IT IS HEREBY FURTHER ORDERED, ADJUDGED AND DECREED that, until further order of this Court, ACC, its directors, officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, who receive notice of this order by personal service, mail, facsimile transmission or otherwise be and they hereby shall:

(a) take such steps as are necessary to repatriate to the territory of the United States all funds and assets of investors described in the Commission's Complaint in this action which are held by them or are under their direct or indirect control, jointly or singly, and deposit such funds into the registry of the United States District Court, Southern District of Florida; and

(b) provide the Commission and the Court a written description of the funds and assets so repatriated.

Nothing in this repatriation order shall be construed as a waiver or limitation of any kind of this Court's ability to enforce its contempt power with respect to any violation of its prior orders entered in this action.

### IV. *Order Requiring Records Preservation*

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that ACC shall preserve any records related to the subject matter of this lawsuit that are in its custody, possession or subject to its control.

### V. *Order Retaining Jurisdiction*

IT IS HEREBY FURTHER ORDERED that this Court shall retain jurisdiction over this matter and ACC in order to implement and carry out the terms of all Orders and Decrees that may be entered and/or to

entertain any suitable application or motion for additional relief within the jurisdiction of this Court, and will order other relief that this Court deems appropriate under the circumstances.

S.D.Fla.,2000.
S.E.C. v. Chemical Trust
Not Reported in F.Supp.2d, 2000 WL 33231600 (S.D.Fla.), Fed. Sec. L. Rep. P 91,291

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.